UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| M.A., a minor, by and through her Natural Mother and Next Friend, P.K., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:10-CV-1740 TCM |
| VILLAGE VOICE MEDIA HOLDINGS, LLC, d/b/a backpage.com, | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

Plaintiff's complaint brashly but ineffectively attempts to plead around the well-established statutory immunity for Internet intermediaries that publish third-party content. The immunity statute, 47 U.S.C. § 230, cannot be evaded by mere artful pleading. Here, defendant Backpage.com, LLC[1] ("Backpage") did no more than publish advertisements that plaintiff's complaint admits were placed by a third party, Latasha Jewell McFarland ("McFarland"). Plaintiff's many references to criminal laws cannot hide the key facts that show the invalidity of her claim: that Ms. McFarland placed the ads in question, and Backpage's role was simply that of an interactive computer service provider covered by Section 230.[2]

Section 230 of the Communications Decency Act makes it clear that Backpage is exempt from civil liability for any content that was provided by third parties (such as McFarland). 47 U.S.C. § 230. The Act's broad immunity provision directs that "no provider

_____

[1] Plaintiff's complaint incorrectly identifies defendant as Village Voice Media Holdings, LLC d/b/a backpage.com., rather than the correct corporate name, Backpage.com, LLC.

[2] Because of plaintiff's inflammatory and accusatory allegations, Backpage is compelled to note for the record that Backpage's cooperation with the authorities contributed to Ms. McFarland's conviction.

(*Backpage.com, LLC*) . . . of an interactive computer service (*Backpage.com*) shall be treated as the publisher or speaker of any information (*the advertisement in question*) provided by another information content provider (*McFarland*)."

Because the plaintiff's complaint is so clearly barred by law, Backpage has moved to dismiss it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  While Backpage does not admit the allegations of the complaint, particularly as they relate to Backpage, it has invoked Rule 12, which requires the court to judge the legal sufficiency of the complaint while treating all well-pleaded allegations of the complaint as if they were true.  *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 519 (8th Cir. 1999) (under Rule 12, court must "take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff").  Given the nature of the allegations, and the falsity of plaintiff's allegations that Backpage knowingly facilitated wrongdoing, Backpage stresses that this brief deals with plaintiff's inflammatory and erroneous allegations about Backpage solely because the procedural rules require that plaintiff's allegations be accepted for purposes of this motion.

## STATEMENT OF ALLEGED FACTS

Backpage.com, LLC is a limited liability company that operates a website that "allows the public to post for a fee, classified advertising for goods and services . . . ."  Compl. at ¶8. plaintiff, P.K., is the mother and next friend of her daughter, M.A., who is a minor.  *Id*. at ¶7.

Plaintiff's claim is based on the allegations that in 2009 and 2010, Latasha Jewell McFarland photographed minor M.A. and placed her photographs of M.A. on Backpage's website in advertisements for an adult escort.  Compl. at ¶9, 10.  Plaintiff asserts that McFarland pled guilty to criminal activities in connection with these actions.  *Id*. at ¶9.  She further asserts that M.A. was a victim of numerous criminal violations by McFarland.  *Id*. at ¶13.  Finally, plaintiff makes various conclusory assertions, unsupported by any specific facts,

- 2 -

that Backpage had knowledge or suspicion as to McFarland's activities and their illegal

purposes.  *Id*. at ¶s 11-13.

## Motion to Dismiss Standard

Plaintiff's claims against Backpage must be evaluated under the heightened pleading

standard articulated by the United States Supreme Court in *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544 (2007).  *Twombly* recognizes that a plaintiff has an obligation to provide more

than "labels and conclusions" in the complaint. *Id.* at 553-55.  A motion to dismiss pursuant

to Fed. R. Civ. P. 12(b)(6) requires a court to determine whether a complaint satisfies the

threshold requirements of Fed. R. Civ. P. 8(a)(2).  Dismissal under Rule 12(b)(6) is proper

when, even assuming the truth of all well-pleaded factual allegations, the plaintiff fails to set

forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  "A

formulaic recitation of the elements of a cause of action" does not satisfy the general pleadings

requirements under the Federal Rules of Civil Procedure. *Id.*  Plaintiffs must plead enough

factual allegations "to raise a right to relief above the speculative level." *Id.* at 1965.

"To determine whether an action fails to state a claim upon which relief can be granted,

the Court must engage in a two-step inquiry." *See Willis v. Buckner*, No. 4:09CV1108 CDP,

2009 WL 2382771, at *1 (E.D. Mo., Jul. 31, 2009).  "First, the Court must identify the

allegations in the complaint that are not entitled to the assumption of truth." *Id.* (citing

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950-51 (2009)).  "These include 'legal conclusions' and

'[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere

conclusory statements.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949).  "Second, the Court must

determine whether the complaint states a plausible claim for relief." *Id.*  "This is a 'context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense.'" *Id.*

"The plaintiff is required to plead facts that show more than the 'mere possibility of misconduct.'" *Id.* "The Court must review the factual allegations in the complaint 'to determine if they plausibly suggest an entitlement to relief.'" *Id.* "When faced with alternative explanations for the alleged misconduct, the Court may exercise its judgment in determining whether plaintiff's proffered conclusion is the most plausible or whether it is more likely that no misconduct occurred." *Id.*

<u>ARGUMENT</u>

I.    BACKPAGE.COM, LLC IS IMMUNE FROM CIVIL LIABILITY FOR THE MESSAGES IN QUESTION, WHICH ORIGINATED FROM A THIRD PARTY.

Backpage is exempt from civil liability arising from content that was contributed by third party users of the backpage.com site.  Section 230 of the Telecommunications Act of 1996, 47 U.S.C. § 230 ("Section 230"), sometimes referred to by the title of the chapter in which it was contained, the Communications Decency Act ("CDA"), precludes liability for Internet dissemination or publication of such third party content.

A.    **Congress Created a National Policy To Encourage Internet Use and Growth**.

In 1996, Congress enacted legislation "(1) to promote the continued development of the Internet and other interactive computer services and other interactive media [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b).

Congress made the reasoned decision not to hold interactive computer service providers liable for user-generated content.  This did not strip the government or wronged parties of redress for problems created by such content, because nothing in Congress' enactment exculpates the original culpable party who posted any unlawful or harmful content.  *See Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).  Congress realized that the "Internet is a unique and wholly new medium of worldwide human communication"; that

internet service providers have hundreds of millions of users; and that it is impossible to screen the hundreds of millions of messages posted daily. *Reno v. ACLU*, 521 U.S. 844, 850 (1997); *Zeran*, 129 F.3d at 330.

For these reasons, Congress enacted Section 230, granting a broad immunity to Internet intermediaries from liability arising from user content. Congress found this measure essential to the growth and development of the Internet. If service providers were "[f]aced with potential liability for every message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted." *Zeran*, 129 F.3d at 331. It is impossible as a practical matter to weed out only objectionable or unlawful content. Without Section 230, service providers would be forced to eliminate much of the legal and legitimate user-generated content that makes the internet so vibrant, or face liability that would shut them down. *See Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003). They would engage in blanket self-censorship or they would be forced to allow so-called "heckler's vetoes" whereby they would be forced to take down any content that prompts a complaint. Useful and constitutionally protected speech would be lost. Section 230 has prevented such undesirable consequences.

**B.     Section 230 Immunizes Interactive Computer Service Providers From Liability For Third Party Content.**

Section 230 implements congressional policy by broadly immunizing Internet intermediaries from liability based on user content. Section 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Furthermore, "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

In *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), the leading and most cited case construing Section 230, America Online ("AOL") was sued in negligence for failing to remove defamatory messages posted on an AOL bulletin board. *Id.* at 329. The Court found that Section 230 by its plain language created "federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Id.* at 330. A service provider cannot be held liable as a publisher of the third party content, nor can it be held liable for exercising "traditional editorial functions," such as deciding whether to publish, withdraw, postpone or alter the content of a third party. *Id.* The court, therefore, held that the claim was barred by Section 230. *Id.* at 327.

Since *Zeran*, "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (internal cites omitted); *see also Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content."); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) ("[W]e too find that Section 230 immunity should be broadly construed."); *Almeida v. Amazon, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (following the "consensus developing across other courts of appeals that § 230(c) provides broad immunity for publishing content provided primarily by third parties"); *Green v. America Online, Inc.*, 318 F.3d 465, 471 (3d Cir. 2003); *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 984–85 (10th Cir. 2000).

Even defamatory, harmful and despicable content is covered by Section 230—with the effect that Internet intermediaries are not liable for that content, and liability rests solely on the original author. In *Zeran*, the content at issue was a series of postings that falsely accused

Mr. Zeran of delighting in the Oklahoma City federal building bombing.  In *Carafano*, the content at issue was a fake dating service posting, portraying Ms. Carafano as sexually promiscuous.  In *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998), the content at issue (content that AOL could have previewed, did in fact edit, and did in fact profit from) allegedly defamed a top White House official.  In all of these cases, courts applied section 230 by its terms, realizing that Congress made the determination that Internet intermediaries can and must be immunized for liability for third-party content, even where that content was wrongful, illegal, and/or harmful.

Section 230 applies to any cause of action, not specifically exempted in the statute, that would hold a service provider liable for the content of another.  This immunity defense has been applied to many different causes of action, including negligence, defamation, invasion of privacy, misappropriation of the right of publicity, state securities and cyberstalking acts, and violations of the Fair Housing Act.  *See, e.g., Carafano*, 339 F.3d 1119 (negligence, defamation, invasion of privacy and misappropriation of right of publicity); *Lycos, Inc.*, 478 F.3d 413 (state securities and cyberstalking acts); *Chicago Lawyers' Comm. For Civil Rights Under Law, Inc.*, 519 F.3d 666 (7th Cir. 2008) (Fair Housing Act).  Section 230 is only limited by the specific exclusions in the statute, which do not apply here.  *See* 47 U.S.C. § 230(e) (providing that the section has no effect on intellectual property, the Electronic Communications Privacy Act, or *federal* criminal law) (emphasis added).

While neither Missouri state courts nor the Eighth Circuit have yet addressed Section 230, Judge Limbaugh recently interpreted Section 230's broad immunity provision in granting a Rule 12 dismissal.  In *Cornelius v. DeLuca*, 2009 WL 2568044 (E.D. Mo. Aug. 18, 2009), the plaintiffs brought claims for defamation and tortious interference with business expectancy against numerous individual defendants who had allegedly posted defamatory information about the efficacy of plaintiffs' nutritional products on a popular website.  Plaintiffs also

brought a civil conspiracy claim against the website operators, alleging that they had "conspired" with the various posters to either post the defamatory material or allow it to be posted.  This civil conspiracy claim, almost certainly brought by plaintiffs in an attempt to plead around Section 230 immunity, gave the Court little trouble.  Judge Limbaugh dismissed the conspiracy claim, finding that "the complaint sets forth no facts that make it plausible that, given the CDA, the moving defendants could be held liable for the statements of others." (Similarly, the present plaintiff's complaint, alleging that Backpage "aided and abetted" in Latasha Jewell McFarland's criminal actions, provides no supporting factual allegations, but rather mere conclusory allegations that Backpage "knowingly" assisted McFarland.  *See infra* at pg. 15).

In addition, all other district courts within the Eighth Circuit that have confronted the issue have also found broad immunity for any cause of action that would hold a service provider liable for user-generated content.  *See Gregerson v. Vilana Finan., Inc.*, No. 06-1164, 2008 WL 451060, at *8 (D. Minn. Feb. 15, 2008); *Faegre & Benson, LLP v. Purdy*, 367 F. Supp.2d 1238, 1249 (D. Minn. 2005); *PatentWizard, Inc. v. Kinko's, Inc.*, 163 F. Supp.2d 1069, 1071–72 (D.S.D. 2001).

### C.    Backpage Satisfies All Requirements for Immunity Under Section 230.

Backpage falls squarely within the requirements of Section 230 and is immune from any non-intellectual property federal or state civil claim which would attempt to impose liability on it arising from the content of third party postings.  Section 230 immunity exists if: (1) Backpage is a "provider or user of an interactive computer service"; (2) the claim is based on "information provided by another information content provider"; and (3) the claim would treat Backpage "as the publisher or speaker" of that information.  *See* 47 U.S.C. § 230(c)(1); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007).  All of these requirements are plainly met.

1.    **Backpage Is A "Provider" Of An "Interactive Computer Service," Namely The Backpage.com Website.**

First, Backpage is a "provider" of an "interactive computer service." *See* 47 U.S.C. §

230(c)(1).  The term "interactive computer service" is defined in the statute as "any

information service, system, or access software provider that provides or enables computer

access by multiple users to a computer server, including specifically a service or system that

provides access to the Internet and such systems operated or services offered by libraries or

educational institutions."  47 U.S.C. § 230(f)(2).

Backpage meets the statutory definition of an "interactive computer service."  Plaintiff's

complaint alleges that defendant, "doing business as 'Backpage.com' operates a website that

allows the public to post for a fee, classified advertising for goods and services . . . ."  Compl. at

¶8.  Under this allegation, Backpage is an "information service or system" which enables

multiple users to access its "computer server," namely the server that hosts its website.  *See*

*Lycos, Inc.*, 478 F.3d at 419.  Websites that allow users to post information have always been

treated as "interactive computer services" under Section 230.  *See, e.g., Lycos, Inc.*, 478 F.3d

413; *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 985 (10th Cir. 2000).

For example, craigslist.com, a similar online classified ad service, has been found to be an

"interactive computer service."  *See Chicago Lawyers' Comm. For Civil Rights Under Law, Inc.*

*v. craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008).

2.    **The Ads In Question Are Posted By Users Of Backpage.com and Thus Are "Information Provided By Another Information Content Provider."**

Second, the ads and other postings on Backpage are "information provided by another

information content provider."  Plaintiff's complaint alleges that Latasha McFarland

"photographed minor M.A.," posted the photographs "on defendant's website, Backpage.com in

advertisements," and paid "Backpage.com for the postings."  Compl. at ¶9.  "Information

content provider" is defined as "any person or entity that is responsible, in whole or in part, for

the creation or development of information provided through the Internet or any other

interactive computer service."  Users of Backpage.com who post the ads, messages or

comments, such as Latasha McFarland, who plaintiff alleges as the poster of the ads in

question here, clearly are "information content providers" distinct from Backpage.  *See, e.g.,*

*Lycos,* 478 F.3d at 419.

Plaintiff's complaint alleges that Backpage operates a website that allows "categorized

advertising for paid female escorts."  Compl. at ¶8.  This type of organization or categorization

does not give rise to liability.  Basic editorial and organizational structures are separate from

the content contained within them.  Use of these categories does not make Backpage

"responsible, in whole or in part, for the creation or development of [the] information . . . ."

*See* 47 U.S.C. § 230(f)(3).

In fact, many if not most "interactive computer services" provide some type of

organization or categories for user-generated content.  Without such, Internet sites and service

using third party content would be chaotic and useless.  For example, in *Chicago Lawyers'*

*Comm. For Civil Rights Under Law, Inc. v. craigslist, Inc.,* Craigslist provided a category labeled

as "apartments," where FHA non-compliant ads were posted, but the mere creation of that

category did not, and could not, reasonably be construed as authorship in whole or part for the

non-compliant content posted within that category, and thus it could not support liability for

Craigslist.  Similarly, in *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC,* 2008 WL

450095 (M.D. Fla. Feb. 15, 2008), where the website www.ripoffreport.com allowed users to

submit reports on companies under such categories as "con artists," "corrupt companies" and

"false TV advertisements," as well as other non-negative categories, the court held that

establishment of such categories did not make the defendant the "information content

provider."  2008 WL 450095, at *10.  *See also Gentry v. eBay, Inc.,* 99 Cal. App. 4th 816, 832

(2002) (eBay's product categories did not make it responsible for ads created by its users for sale of bootleg materials).

Notably, by structuring its service to isolate sexually related content from other content, Backpage.com is utilizing a procedure that Congress encouraged and protected in the CDA. Section 230(c)(2) specifically states:

> No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

This portion of Section 230, commonly known as the "Good Samaritan" provision, was enacted to encourage web publishers and intermediaries to restrict arguably improper user content, without facing liability because of those actions. This subsection overruled the prior law, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct., May 24, 1995), which had treated a service provider as a "publisher" solely because it searched for and revised some offensive user material. *Id.* at *4. Congress voided *Stratton Oakmont* in order to take away disincentives to provider-related measures to restrain or edit possibly offensive material. *See* H.R. Conf. Rep. No. 104-458, at 194 (1996) ("One of the specific purposes of this section is to overrule *Stratton Oakmont v. Prodigy* and any other similar decisions which have treated providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material."). Thus, the alleged actions of Backpage in categorizing and segregating adult content are additionally protected because, in addition to the fact that the categorization is independent of the underlying content at issue, that categorization also falls within the protection of the Good Samaritan provision of Section 230.[3]

---

[3] Although beyond the scope of the allegations in the complaint, Backpage notes for the record that it has voluntarily taken efforts to isolate sexually related content, by using categories

3.     **Backpage is Immune From Civil Liability Because Plaintiff Seeks to Hold Backpage Liable for Publishing the McFarland Ad.**

Since Backpage is the provider of an "interactive computer service" and the ads and postings on Backpage.com are "information provided by another information content provider," Section 230 provides that it cannot be held liable "as the publisher" under any state or local law for the content of those ads or postings.  47 U.S.C. § 230(3)(1).

Because Backpage could only be liable for user-posted content if it were treated "as the publisher," imposition of any such liability is clearly prohibited by Section 230.  This is so because Congress in enacting Section 230 realized that while brick-and-mortar publishers have a duty to review and screen material, imposition of such requirements on the Internet would be virtually impossible and would effectively shut down the medium, which Congress viewed as essential to the country's growth and future.  *See e.g., Zeran*, 129 F.3d at 330, 333 ("the sheer number of postings on interactive computer services would create an impossible burden in the Internet context;" and so "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred").

Plaintiff alleges classic publishing liability here.  Plaintiff alleges that McFarland posted M.A.'s photograph "on defendant's website, backpage.com in advertisements . . . ." and that Backpage "posted many advertisements . . . on defendant's backpage.com website and received fees for each posting."  Compl. at ¶10.  Plaintiff seeks to hold Backpage liable for this "posting"

---

clearly identifying such content, and by requiring users to go through warning and adult-screening entry screens, before entering those categories.  It also uses sub-category labels to zone off and separate adult material from family-friendly ads.  By these techniques, users can stay clear of such categories they find objectionable, and can also use filtering and blocking software to prevent themselves or their children from viewing such material, without also blocking appropriate ads.

(*i.e.* publishing) of content.  Furthermore, even to the extent that plaintiff attempted to characterize its complaint as alleging "distributor" liability (*i.e.* by suggesting that Backpage aided and abetted McFarland's original publication (Compl. at ¶12)), Section 230 still clearly applies.  *See Zeran*, 129 F.3d at 331-32 (holding that distributor liability is merely a subset of immunized publisher liability).  No matter how the cause of action is labeled or the complaint is read, Backpage is immune from any liability for the content and distribution of third party information.  It cannot be held liable as a publisher or as a distributor, whether the focus of the claim is on posting the material, not removing the material, failing to implement better protective measures, or any other actions.  *Zeran*, 129 F.3d at 330; *Doe v. Myspace, Inc.*, 528 F.3d 413, 419–20 (5th Cir. 2008).

### 4.    The Commercial Nature of Backpage.com Is Irrelevant.

The fact that Backpage and its Backpage.com service operate on a for-profit basis is completely irrelevant to the Section 230 analysis.  In just about every case involving Section 230, the interactive computer service provider was a for-profit company.  It also is irrelevant that Backpage is potentially making money off of user ads, even if it ultimately develops that some of them contain illegal content.

In *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998), AOL entered into a contract for Drudge to create content that would be posted on AOL.  Drudge, after writing his Drudge report, would email it to AOL, which would then post it on its services.  *Id.* at 48.  AOL paid Drudge $3,000 a month.  *Id.* at 47.  One of the reports contained false and defamatory statements.  *Id.* at 47–48.  The Court found it irrelevant that Drudge was paid by AOL to create the content, or even that AOL actively and aggressively promoted and advertised it.  *Id.* at 51.  Section 230's broad sweep immunized AOL from liability.  *Id.* at 53.  By the same token, it is irrelevant that Backpage.com charges for ads or makes money off of its service

5. **Section 230 Immunity Attaches to Plaintiff's Civil Causes of Action, And Plaintiff's References to Criminal Statutes Are Irrelevant.**

Attempts, like plaintiff's here, to creatively plead around Section 230's civil immunity have been properly rejected by other courts. Plaintiff postures this case as if it were one brought under federal criminal law, because Section 230 does not cover federal criminal prosecutions. *See* 47 U.S.C. § 230(e)(1). But, as other courts have found in similar situations, a civil plaintiff's reference to a federal criminal statute does not, cannot, transform a civil lawsuit covered by Section 230 into a criminal prosecution that is not covered by Section 230.

In *Doe v. Bates*, No. 5:05-CV-91-DF-CMC, 2006 WL 3813758 (E.D. Tex., Dec. 27, 2006) the plaintiff brought a complaint against Yahoo! Inc. ("Yahoo") related to its hosting of the "Candyman" e-group (an internet chat room) where illegal child pornography was discussed and shared among users. The plaintiff alleged that Yahoo was liable under 18 U.S.C. §2252A (as well as numerous other state law causes of action) – an identical cause of action as alleged by present plaintiff. *See* Compl. at ¶4 (alleging private cause of action under 18 U.S.C. §2255 for violation of 18 U.S.C. §2252A).

The Magistrate in *Doe* recommended that the plaintiff's complaint be dismissed under Section 230; the district court agreed and dismissed the complaint. The district court specifically found that plaintiff's federal claim under 18 U.S.C. §2252A "did not fit within any exception" to Section 230's immunity from civil liability. The fact that Plaintiff relied on a statute that also included criminal penalties did not change the Section 230 analysis. Adopting the reasoning from *Zeran*, the district court noted that "Congress has decided that the parties to be punished and deterred are not the internet service providers but rather those who created and posted the illegal material . . . ." Thus, according to the district court, "[t]he Magistrate Judge correctly found that 'Congress decided not to allow private litigants to bring civil claims based on their own beliefs that a service provider's actions violated the criminal laws.'" *Doe* is

- 14 -

dispositive of the present plaintiff's identical claim here. *See also Dart v. Craigslist, Inc.*, 665 F. Supp.2d 961, fn. 6 (N.D. Ill. 2009)(agreeing with the holding in *Doe v. Bates* that civil actions, even those based upon a private cause of action resulting from the violation of a criminal statute, do not fall within the narrow statutory exception to Section 230's broad grant of immunity because such a civil action is not the "enforcement" of a criminal statute); *Goddard v. Google, Inc.*, 2008 WL 5245490 at *5, fn. 5 (N.D. Ca., Dec. 17, 2008) (same holding).

## II. PLAINTIFF'S BARE RECITAL THAT BACKPAGE "AIDS AND ABETS" CRIMINAL SEXUAL ABUSE OF CHILDREN IS INSUFFICIENT UNDER *IQBAL*, *TWOMBLY* AND *ZERAN* TO STATE A CLAIM.

Section 230 immunity requires the dismissal of plaintiff's complaint for the reasons explained above in Section I.  Plaintiff's attempt to creatively "plead around" Section 230 immunity by alleging that Backpage "aids and abets" criminal violations – predicated upon Backpage's alleged knowledge – is irrelevant as a matter of law, because such knowledge, even if it existed, would not defeat Section 230 immunity. *See Doe v. Bates*, 2006 WL 3813758 at *3-4 (rejecting plaintiff's contention that actual knowledge of tortious conduct precludes Section 230 immunity (following *Zeran*)).

Furthermore, even assuming *arguendo* that Backpage's knowledge somehow become relevant to the issue of Section 230 immunity, the defective manner in which plaintiff has attempted to allege Backpage's knowledge renders the complaint subject to dismissal pursuant to *Iqbal* and *Twombly*.  Plaintiff's complaint sets forth numerous conclusory allegations regarding Backpage's knowledge in paragraphs 11 through 13, none of which include any facts to support these conclusions. This Court cannot accept as valid plaintiff's allegations of knowledge on the part of Backpage, as they are nothing more than "threadbare recitals of a cause of actions elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Plaintiff's allegations are mere "labels and conclusions," which are

- 15 -

insufficient to overcome the statutory immunity under Section 230. Furthermore, two of plaintiff's allegations of "fact" are simply (incorrect) legal conclusions,[4] and the Court is not required to accept the truth of such allegations. *Id.* at 1949. The factually unsupported "knowledge" element that plaintiff attempts to attribute to Backpage is also incorrect.[5] In sum, plaintiff's allegations of Backpage's knowledge of illegality are insufficient under the pleading standards set forth in *Twombly* and *Iqbal*, and even if the allegations were true, they are legally irrelevant to the applicability of Section 230's broad immunity provision.

_____

[4] Specifically, the statements "[t]hat the immunities and legal construction that an internet provider shall not be treated as the publisher or speaker of posted information that are provided in 47 U.S.C. Section 230, (Communication Decency Act) do not apply to this action as 47 U.S.C. Section 230(e)(1) does not impair matters of enforcement of rights by victims of violations under Title 18, Chapter 110, relating to the exploitation of children. This exemption specifically includes 18 U.S.C. Section 2255 and the statutes included therein." (Compl. at ¶5) and that "[p]ursuant to 47 U.S.C. Section 230, no immunity attaches in favor of Defendant as Defendant has aided and abetted crimes against a child under 18 U.S.C. Sections 2251, 2252, 2252A, 2421, 2422, 2423, related to maintaining and operating backpage.com which is a facilitator of child pornography and facilitator of child prostitution." Compl. at ¶14. These legal assertions are clearly incorrect. *See* pp. 14-15, *supra*.

[5] Backpage suggests the following factual context, to allow the Court, as permitted under *Iqbal*, to draw upon its "experience and common sense" in a "context-specific manner" to determine whether plaintiff's complaint states a plausible claim.

As with virtually all websites, use of Backpage.com is governed by "Terms of Use" which users must affirmatively agree to before they can utilize the service. The terms are also linked to from the main page at Backpage.com, so users can readily consult them. These terms prohibit posting such "material of any kind or nature that encourages conduct that could constitute a criminal offense, give rise to civil liability or otherwise violate any applicable local, state, provincial, national, or international law or regulation, or encourage the use of controlled substances." Before any user can enter any category in the "personals" or "adult" section, the Backpage.com site requires the user to read and agree to entry terms. When users report non-complying material, Backpage.com takes reasonable efforts to promptly remove offending advertisements. Each month Backpage removes almost 150,000 ads from among more than one million posted in that time period on Backpage.com. Furthermore, Backpage works with appropriate law enforcement officials when requested to do so. Common sense, and the legislative history of section 230 concerning the volume of Internet traffic and the difficulties in requiring service providers to police all of their users' conduct, strongly suggests that if any improper advertisements appear on Backpage.com, they do so because of the volume and the difficulty of reviewing and editing the advertisements, not, as plaintiff alleges without factual support, because of a nefarious desire by Backpage to aid and abet prostitution.

**Conclusion**

For the foregoing reasons, Backpage respectfully requests that the Court dismiss plaintiff's complaint in its entirety.

Respectfully submitted,
THOMPSON COBURN LLP

By:  /s/ Michael L. Nepple
    Mark Sableman #36276 MO
    Michael L. Nepple #42082 MO
    One US Bank Plaza
    St. Louis, Missouri 63101
    (314) 552-6000 (telephone)
    (314) 552-7000 (facsimile)
    *msableman@thompsoncoburn.com*
    *mnepple@thompsoncoburn.com*

Attorneys for Defendant Backpage.com, LLC

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned hereby certifies that a true copy of the foregoing was filed electronically with the Clerk of the Court to be served via operation of the Court's electronic filing system this 22nd day of November, 2010, upon all counsel of record.

                                       /s/ Michael L. Nepple