UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| M.A., a minor, by and through her Natural | ) | |
| Mother and Next Friend, P.K., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  4:10-CV-1740 TCM |
| vs. | ) | |
| | ) | |
| VILLAGE VOICE MEDIA HOLDINGS, | ) | |
| L.L.C., d/b/a Backpage.com | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| BACKPAGE.COM, LLC | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO**

**DEFENDANT'S MOTION TO DISMISS**

**I. INTRODUCTION**

Plaintiff (plaintiffs are a minor and her mother next friend and will be referred to as "plaintiff") brought suit directly under two private civil action statutes, 18 USC 1595 and 18 USC 2255 (hereafter referred to as "Private Action Statutes"), which allow civil actions for violations of the criminal sections listed therein.  Alternatively, suit is brought under the authority of a treaty, the Optional Protocol, as these Private Action Statutes are the domestic remedial mechanism which allows the enforcement of the primary rights granted to individuals in the treaty.  The asserted basis for dismissal is that it is immune from liability based upon 47 USC 230 (hereafter "Section 230").  Plaintiff asserts infra for various reasons, that section 230 does not shield defendant from this suit.  Initially though, by way of response to a claim of Backpage.com that its cooperation with authorities contributed to McFarland's conviction,

1

plaintiff wishes to put that assertion into perspective.  To our knowledge Backpage.com simply provided copies of the pertinent ads and internet information about the ads originators upon the request of the F.B.I.  This information could have easily been subpoenaed as Backpage.com, in a press release, admits has occurred on numerous occasions in the past in matters involving minors.  In this case plaintiff had already informed the F.B.I of the identity of the trafficker and how the ads were purchased.  Backpage simply confirmed this information.  Taking credit as a champion of fighting child sex trafficking as Backpage.com did in a press release issued in reply to this suit is analogous to the arsonist claiming credit for giving the fire department a garden hose.

Plaintiff reasserts its claim that Backpage.com facilitates child sex trafficking and this assertion is joined by twenty-two States Attorneys General, who together sent a letter to the attorney for Backpage.com stating that ads trafficking children are rampart on Backpage.com. The Attorneys General requested Backpage.com refuse to accept these types of ads and end the sexual trafficking and misery of children victims, who may be exploited by these ads. Missouri's Attorney General, Chris Koster said that Backpage.com was a portal for prostitution in our community, and that Backpage.com has crossed the line in allowing ads that promote prostitution.  This letter and statement of Koester can be found at:

http://ago.mo.gov/newsreleases/2010/AG_Koster_calls_on_backpage_to_shut_down_its_adult_services_section/

Regarding the identifying of the defendants, the plaintiff sued Village Voice Media Holdings, LLC d/b/a Backpage.com based upon information developed that this entity was the owner of the "Backpage.com" domain name.  Defendants' attorney entered and then asserted that Backpage.com, LLC owned the website, but has not yet produced evidence or a written

2

representation of fact that the first entity does not own the domain name or co-own the website on this matter to permit dismissal without prejudice.

There are four basic reasons, with some significant overlap in legal principles, why section 230 does not shield defendant from this lawsuit.  Each basis will be discussed below. Each basis is asserted in the alternative and conjunctive.

## II. THE BACKPAGE.COM WEBSITE SPECIFICALLY ENCOURAGES, PROMOTES AND PROFITS FROM PROSTITUTION AND IS SUED FOR THIS CONDUCT NOT FOR THE CONTENT OF ITS POSTINGS

The first basis is that defendant is specifically not being sued for posting the content provided by McFarland.  In this theory, the action is based upon the creation and maintenance of this particular website.  This website business is designed to profit by knowingly luring prostitutes and sex traffickers to place ads on Backpage.com.  Specifically it is alleged that Backpage.com aggressively invites these nefarious people to join with them in an illegal venture to effectively advertise illegal sexual services.

Factually, it is specifically alleged, that within defendant's internet marketing materials or on their website and under their authorship, the following information and matters are available for review or confirmation:  the website has a search engine for the adult categories that allow focused searches of postings by keywords, such as "rates"; defendant developed the value of the posted ads by working to create a highly viewed website that claims billions of page views of their ads per week; the website claims to be a highly tuned marketing site; the websites adult categories are thinly veiled ads for prostitution services; the website gives direction regarding how to increase the impact of ads for a fee; defendant offers special ad placement and re-posting

for a fee; defendant advertises its website to develop a larger following; defendant removes spam to increase page view; defendant offers commissions for customer referrals; most significantly defendant has posting rules which aid and assist in the slight veiling of illegal sex services ads by limiting word usage and prohibiting rates for times in fractions of hours; and instructs posters how to pay anonymously through the internet for posts protecting traffickers from law enforcement if public computers are used.  Defendant is aware of prior cases of minors being sexually trafficked on its website and based upon the posted ads and photography, no reasonable person could review the postings in the adult categories and deny prostitution was the object of almost each and every ad.  This is not a hidden secret and defendant must be aware of what is common knowledge about their adult services webpages.

Defendant earns a fee for each of these postings.  It is basic logic that if the minor sex trafficker's ads on Backpage.com, are profitable to traffickers, the traffickers will return to place additional ads until their property (trafficked child or adult) is no longer useful or available.  A profitable venture for the traffickers makes a profitable venture for Backpage.com.  Therefore, Backpage.com is materially responsible for the development of the unlawful conduct, and contributed materially to the ads unlawful character.  See the argument in Section IV. B., Infra, that such conduct converts defendant into an information content provider in addition to being an interactive computer service user.  The above argument is incorporated therein.

Since the creation and maintenance of the website that facilitates prostitution is the basis of the claim, and not any particular ad language, Section 230 immunity is not implicated.  Plaintiff's theory of liability is as follows:  defendant solicits, invites, facilitates and seeks the participation of others for the purpose of mutual profit and benefit.  Defendant profits by creating

4

and maintaining a means for others to violate the law, while the posting traffickers profit by

trafficking their sex slaves.  18 USC 1595, places civil liability upon:

> "Whoever knowingly benefits, financially, or by receiving anything of value
> from participation in a venture, which that person knew or should have known,
> has engaged in an act in violation of this chapter."

This language was added in a 2008 amendment, long after the Section 230 immunity was

enacted.

Liability under Section 18 USC 2255 is also very broad and holds that any victim of

certain other statutes recited therein (including those raised in the Amended Complaint) who

suffered personal injury may sue for their damages.  A reading of these statutes makes clear that

suit it authorized against those participating in violations of these two sections.  In this case, not

only is defendant a participant, but defendant is also the river through which internet sexual

trafficking flows.  It is the creation and maintenance of this highly effective internet tool that

violates these Private Action Statutes.

Section 230 is not implicated under this theory of liability as it is not based upon treating

the defendant as publisher of the content of the ads, but in effect, defendant is treated as an aider

and abettor of minor sex trafficking by virtue of their above culpable conduct.  In Doe v.

Liberatore, 478 F.Supp.2d 742 (M.D.Pa. 2007) the court held that under 18 USC 2255, a party

could be liable to a victim of child exploitation, molestation, and pornography, even if they were

not the perpetrator of the acts.  Liability would arise through 18 USC 2, the aiding and abetting

statute.  Id, at 756.  After analysis of the facts, including a review of the "ostrich instruction", the

court therein held that there was no evidence that the Diocesan defendants in that case desired

that the crimes be accomplished.  Here there is ample evidence of such a desire.  Everyone

knows that a satisfied customer is a key to return business.  The defendants have certainly

demonstrated their primary desire for profit.  This site should be liable for the damage it continues to inflict upon society.

In this case there is ample evidence and inferences that can be drawn therefrom to support the allegation that Defendant profited from the completed trafficking crimes.

Under 18 USC 2, the aiding and abetting statute, knowledge of the crime can be inferred. The jury is given an instruction know as the "Ostrich Instruction."  The Ostrich Instruction "allows the inference of knowledge if it is found that the putative aider and abettor had a strong suspicion yet shut its eyes for fear of what he would learn." Id., at 757.  In United States v. Talkington, 875 F 2d 591 (7th Cir. 1989), the court held that it is possible to infer knowledge from a combination of suspicion and indifference to truth, at 595.  Also see United States v. Jewell, 532 F 2d 697 (9th Cir. 1976) Id.

Under 18 USC 2255, based upon Doe, supra, 18 USC 2 aiding and abetting must be proven, but under 18 USC 1595, the statute sets forth its own culpability mens rea standard.  This is a "knew or should have known" standard.

Defendant has created a forum to facilitate sex trafficking, which is known to include a significant percentage of minors.  In effect, defendant created a safe house online for traffickers and those seeking sex, which avoids the normal channels of law enforcement interdiction, making the venture lucrative indeed.   Finally, should a website that solicits and facilitates illegal conduct be protected under the guise of a free internet?  The policy choice is clear and the internet is strong.  Protection of this website for this type of conduct is indefensible under the guise of fostering a healthy internet.  This type of conduct is more akin to a cancer on the

6

internet.  Are "livesuicideonline.com" and "hireahitman.com" sites that we, as people should permit?

### III. BACKPAGE.COM CANNOT AVAIL ITSELF OF SECTION 230 IMMUNITY BECAUSE THE IMMUNITY DOES NOT APPLY TO CONDUCT THAT VIOLATES CHAPTER 110 OF TITLE 18 OR ANY OTHER FEDERAL CRIMINAL STATUTE.

The second basis why Section 230 does not immunize defendant from liability is because the language of Section 230 (e)(1) states:  Nothing in this section shall be construed to impair the enforcement of …… chapter….110 (relating to sexual exploitation of children) of title 18, or any other federal criminal statutes.  In the Federal Code Title 18 is titled "Crimes and Criminal Procedure".  Part I comprises sections 1-2725 and is titled "Crimes".  Chapter 77, which encompasses the "Civil Remedy" Section 1595, is titled "Peonage, Slavery, and Trafficking in Persons."  Chapter 110, which encompasses Section 2255 the "Civil Remedy for Personal Injuries" is titled "Sexual Exploitation and Other Abuse of Children".  Both civil remedy sections are within the title, part and chapter of the United States' criminal laws.  These Private Action Statutes allow victims of these crimes to recover damages from those who are guilt of violations of crimes set forth in the civil remedy statute.  By the very language of Section 230, enforcement of chapter 110, which includes Section 2255, is not impaired.  The word "enforcement" is defined in Black's Law Dictionary, 5th edition, as: "The act of putting something such as a law into effect; the execution of a law; the carrying out of a mandate or command."  Based upon the plain meaning, there is no reason the enforcement of Section 18 USC 1595 should be impaired as it is plainly within the criminal code of the United States.  In order to be liable under these Private Action Statutes, a plaintiff must prove that the defendant

violated any of the Sections referenced therein, directly or as aider and abettor under Section 18 USC 2.  A crime must be committed by defendant.

Therefore, although, the applicability of the immunity set forth in Section 230 (c) may be valid in most situations, it cannot reach the liability of defendant as a publisher or speaker of information provided by another in matters where the defendant violates any of these statutes.  A conviction under the criminal code is not a prerequisite to liability under the Private Action Statutes.  See Doe, supra, at 754, and Smith v. Husband, 376 F.Supp. 2d 603 (E.D.Va.2005).

Any reliance upon Doe v. Bates, 474 F.Supp. 2d 843 (E.D.Tx.2006) is not persuasive. The logic and reasoning therein is confusing.  The court held that Yahoo, a true internet service provider as opposed to defendant, (see Section 230 (f)(2) definition of interactive computer service), was immune from suit under 18 USC, 2255 for violations of child pornography laws.  It was not alleged therein that Yahoo was also an information content provider (see discussion infra).  The court held that although the government can undisputedly criminally prosecute internet service providers for alleged violations of 18 USC, 2252 relating to child pornography, it cannot allow a private civil liability suit because of the "obvious chilling effect" that the threat of litigation would have on internet service providers.  Plaintiff contends that it is exceedingly difficult to understand how a civil suit for money damages creates a greater chilling effect than a jail term.  It seems apparent that Congress wanted to extend this Section 230 immunity only to conduct which does not rise to the level of criminal conduct.  It does not seem apparent that the immunity would stretch one length for criminal prosecutions and another for the civil enforcement of statutory remedies for violations of these same crimes.  There is no reason or Congressional intent to support such a position.  In Section 230, Congress set forth the policy of the United States as it relates to Section 230 as follows in part: "(5) to ensure vigorous

enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking and harassment by computer."

The Doe v. Bates, supra, court also held that if an intentional violation of criminal law should be an exception to Section 230 immunity, such holding would effectively abrogate immunity based solely upon an allegation by plaintiff.  Clearly, the court questioned plaintiffs bare assertion that Yahoo intentionally profited by knowingly displaying child pornography.  This is indeed an unsupported stretch.  Therefore, the court overreached by its holding that no allegation of criminal conduct will get around Section 230 immunity.  This overreaching holding put a bar at the door protecting the internet businesses over child welfare.  A better reasoned approach by the Doe v. Bates Court would be to have required more specific factual allegations in the complaint to support its allegations of criminal conduct by Yahoo.  This is along the lines of the Iqbal, Twombly and Zeran argument raised by Backpage in part II of its memorandum.  In comparison, see the Amended Complaint, which lays out very specific facts relating to the matter of operation of the website, the content of the ads, the prior knowledge of trafficking minors, the marketing of the website, the assistance to its customers to remain anonymous and how it helped veil the true prostitution intent of the ads.  Plaintiff also, as graphically as decorum allowed, discussed the type of photographs and ad language allowed on its site.  Certainly, Backpage.com isn't going to claim that its agents and employees didn't have knowledge of the photographs of sexual penetration and offers of all types of sexual conduct for compensation from which it was profiting.  Backpage.com cannot claim it is an AOL or a Yahoo.  Their adult categories ads were an "in your face" disgusting forum for offers of prostitution services, children included.

The holding in Doe v. Bates, supra, should not be followed.  It is flawed.  An allegation of fact can never destroy a statutory immunity from liability.  Doe v. Bates, supra, attempts to

9

create immunity from suit, akin to the protection afforded government officials.  Plaintiffs

allegations in the Amended Complaint are certainly specific enough to distinguish <u>Doe v. Bates</u>,

and to overcome the Iqbal, Twombly and Zeran test.


## IV.  SECTION 230 IMMUNITY DOES NOT APPLY TO DEFENDANT (A) BECAUSE DEFENDANT IS NOT AN INTERACTIVE COMPUTER SERVICE, AND (B) BECAUSE DEFENDANT IS AN INFORMATION CONTENT PROVIDER

### A.  Backpage.com Is Not Entitled To Section 230 Immunity Because It Is Not an Interactive Computer Service

Although there are cases to the contrary, it is plaintiff's contention that defendant is not

entitled to Section 230 (c)(1) immunity, because that immunity should only apply to "Interactive

Computer Service" providers.  This term is defined in Section 230 (f), as "means any

information service, system, or access software provider that provides or enables computer

access by multiple uses to a computer server….."  By way of further explanation of what is a

service provider, plaintiff cites 17 USC 512 of the Digital Millennium Copywrite Act.  A

computer "service provider" is defined therein at (1)(A), as "an entity offering the transmission,

routing, or providing connections for digital online communications, between or among points

specified by a user, of material of the user's choosing, without modifications to the content of the

material as sent or received."

Plaintiff appreciates that each definition is applicable to different acts, but it is obvious

even in Section 230, that Backpage.com isn't an internet service provider.  A website is

contained in servers.  A service provider allows transmission access.  It is plaintiff's position that

since the posters and viewers of the Backpage.com ads must have internet service that the

immunity only applies to the internet service providers and not websites.

A broad interpretation of the immunity encompassing all internet websites and service providers would require the same broad interpretation of who is an "information content provider".  See Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003), which holds that all website operators are immune as "users" of  interactive computer service at 1030.  Therefore, if Backpage.com is immune as a user of an interactive computer service, all present on the internet, would be granted that immunity, subject to losing immunity by its additional conduct making it an information content provider.

**B.  Section 230 Immunity Doesn't Apply to An Information Content Provider and Backpage.com is an Information Content Provider Because it is Responsible in Part for the Development or Creation of Information Provided Through the Internet**

Many courts have given a broad interpretation of the phrase in Section 230 (c)(1), "provider or user of an interactive computer service" so as to protect all true internet service providers and websites.  Therefore, to be consistent, courts must give the same broad interpretation to the phrase "provided by another information content provider ."  This is because if Backpage.com is an "information content provider" for the ads posted on its website, it falls outside the  immunity.  See Bartzel, supra, at 1031, and Fair Housing Coun., San Fernando v. Roomates.com, 521 F.3d 1157 (9th Cir. 2008), at 1167.1168.  The immunity is Section 230 (c)(1) by its terms applies only if the defendant is a "user or provider" of an internet computer service and not also an "information content provider."  The burden is on defendant to show its falls within the immunity.  See Bartzel, at 1030.  To grant unfettered protection to information content providers would serve only half of Congress's intent.  There is a dual purpose in Section 230.  One is the fostering of e-commerce.  See Bartzel, supra; Blumenthal v. Drudge, 992 F. Supp. 44 (D.D.C. 1998); and Section 230 (a) and (b).  The second purpose is to cause self-policing for

obscenity and offensive material to protect children.  See Bartzel, supra; 141 Cong. Rec. H. 8469-70; Zeran v. American Online, Inc., 129 F.3d at 331 (4th Cir. 1997); Blumenthal, supra, at 52; and note the name of the act "Communicative Decency Act".

These two interests may compete, but this simply requires a policy balancing of these interests.  See Bartzel, supra, at 1028.  Certainly, the First Amendment does not protect speech involving obscenity and lewdness.  See Roth v. United States, 354 US 476 (1957).  The holding in Roth resulted in the upholding of a conviction of an individual for commercial exploitation by the distributing of obscene materials in the mails.

The definition of information content provider is critical.  Section 230 (f)(3) states:

> The term "information content provider" means any person or entity that is responsible, in whole or part, for the creation or development of information provided through the Internet or any other interactive computer service.

Plaintiff is unaware of any case that has granted immunity to an information content provider.

It is plaintiff's contention that Backpage.com is responsible in part for the development of the prostitution ads on its website, which it knew or should have known included minor children.  The key word here is "development".  The Webster's Universal Dictionary & Thesaurus (1993) defines "development" as "the process of growing or developing".  "Develop" is defined therein inter alia, as "to improve the value of".  In Fair Housing, supra, at 1168, the Court focused upon the word "development" in holding defendant Roomates.com liable as an information content provider.  It held at 1167-1168 that:

> We believe that both the immunity for passive conduits and the exception for co-developers must be given their proper scope and, to that end, we interpret the term "development" as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness.  In other words, a website helps to develop unlawful content, and thus falls within the exception to Section 230, if it contributes materially to the alleged illegality of the conduct.

12

Plaintiff has alleged the facts that make defendant a developer, and therefore, a contributor to the illegality of the conduct herein, in Section II, infra, and therefore will not repeat these allegations again.  Suffice it to say that defendant knows that the venture in which it voluntarily participates is a venture where it and traffickers profit from prostitution, wherein, a substantial number of children are being statutorily raped.  It also knows that a vast number of ads are appearing on its website for prostitution and that it is doing much to maintain and improve its profitable prostitution forum.

In <u>Anthony v. Yahoo!, Inc.</u>, 421 F. Supp. 2d 1257 (N.D. Cal. 2006) the court held a defendant liable as an information content provider for luring people into paying defendant money for subscriptions by illegal fraudulent conduct.  See <u>Id.</u>, at 1262.  The Court acknowledged that if the alleged manner of posting information constitutes illegal conduct, there is no immunity.  See <u>Id.</u>, at 1263.

For all of these reasons, defendant cannot show that it is not an information content provider and therefore, cannot fulfill its burden that it falls within the immunity.

## V.  OPTIONAL PROTOCOL CREATES PRIMARY RIGHTS FOR PLAINTIFF WHICH ARE ENFORCEABLE BY THE JUDICIARY BY THE ALLEGED PRIVATE ACTION STATUTES, THEREFORE THE PRIMARY RIGHTS TAKE PRECEDENCE OVER ANY IMMUNITY STATUTE.

### A. OVERVIEW

The Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography (hereafter "treaty" or "Optional Protocol") is judicially enforceable in U.S. Courts because the treaty creates primary rights for individuals,

13

and Sections 18 U.S.C. 1595 and U.S.C. 2255 (Private Action Statutes) provide a remedial mechanism that authorize private suits to enforce those primary rights in the courts.  The two distinct issues which are often conflated are: (1) whether treaties grant primary rights to individuals, and (2) whether domestic law provides a remedial mechanism to enforce those rights in courts.  It is evident from a reading of the plain meaning the text of the Optional Protocol that many of its provisions create primary rights for children.  The Optional Protocol specifically seeks to set forth a holistic system of children's rights under the domestic law of each signator state as applied to foreign and domestic children within the signator's territory.  Moreover, as the primary rights of individuals set forth by the Optional Protocol do exist, these rights must be enforced as a matter of domestic law, as well as international law, because the Optional Protocol is the Law of the Land under the Supremacy Clause.

Any contention that the Optional Protocols are not judicially enforceable because the treaty does not expressly create domestic judicial remedies is contrary to  two centuries of American jurisprudence.  Furthermore, the Supreme Court has repeatedly enforced treaties that did not expressly create domestic judicial remedies.  From the early days of the republic until recently, the Supreme Court has applied a simple principle: where a treaty creates primary rights for individuals, and where other provisions of domestic law create a procedural mechanism for enforcement of those rights, individuals whose treaty rights have been violated can use those domestic remedial mechanisms to obtain judicial remedies enforcing those rights.  As applied to the present case, these principles shows that the Optional Protocol is judicially enforceable because it creates primary rights for individuals and the private action statutes provide a remedial mechanism for enforcement of those treaty rights.

The relevant portions of the Optional Protocol are:

Believing that the elimination of the sale of children, child prostitution and child pornography will be facilitated by adopting a **holistic** approach, addressing the contributing factors, including underdevelopment, poverty, economic disparities, inequitable socio-economic structure, dysfunctioning families, lack of education, urban-rural migration, gender discrimination, irresponsible adult sexual behaviour,  harmful traditional practices, armed conflicts and **trafficking of children** [Emphasis Added.]

**Article 2.**        1. For the Purpose of the Present Protocol:

(b)    Child prostitution means the use of a child in sexual activities for remuneration or any other form of consideration;

(c)   Child pornography means any representations, by whatever means, of a child engaged in real or simulated explicit sexual activities or any representation of the sexual parts of a child for primary sexual purposes.

**Article 3.**        1. Each State Party shall ensure that, as a minimum, that following acts and  activities are fully covered under its criminal or penal law, whether these offences are committed domestically or transnationally or on an individual or organized basis:

(b) **Offering**, obtaining, procuring or **providing** a child for prostitution, as defined in article 2;

(c) Producing, **distributing**, **disseminating**, importing, exporting, **offering**, selling or possessing for the above purposes child pornography as defined in article 2.

2. Subject to the provisions of a State Party's national law, the same shall apply to an **attempt to commit** any of these acts and to **complicity** or **participation** in any of these acts.

**Article 9.**        4. States Parties shall **ensure** that all child victims of the offences described in the present Protocol have access to **adequate procedures to seek, without discrimination, compensation for damages** from those legally responsible.

5. States Parties shall take appropriate measures aimed at effectively **prohibiting** the production and **dissemination** of material **advertising** the offences described in the present Protocol.

**Article 16.**        3. When an amendment enters into force, it shall be binding on those States Parties that have accepted it, other States Parties still being bound by the provisions of the present Protocol and any earliest amendments that they have accepted. [Emphasis Added]

## B. OPTIONAL PROTOCOL CREATES, PRIMARY RIGHTS FOR INDIVIDUALS

More than a century ago, the Supreme Court distinguished between treaties that are an agreement between States and treaties which confer rights upon people, *Head Money Cases*, 112 U.S. 580 (1884).  There is an important difference between treaties that create primary rights for individuals and treaties that merely regulate relations between states.  The question whether a treaty creates primary rights for individuals is a question of treaty interpretation.

Courts look to the plain meaning of the language of the treaty to make this interpretation. See Geofroy v. Riggs, 133 U.S. 258, 271 (1890)(when interpreting treaties, "words are to be taken in their ordinary meaning, as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law").  Where the plain meaning of the treaty text manifests the drafters' intent to protect individual rights, the treaty does create primary rights for individuals.  See LaGrand (Germany v. U.S.), 2001 I.C.J., available at www.icj-cij.org (rejecting U.S. argument that Vienna Convention on Consular Relations does not create individual rights, and relying on plain meaning of treaty to support holding that Article 36(1) of that treaty creates primary rights for individuals).  In Hamdan v. Rumsfield, 548 U.S. 557 (2006), the court held that Osama bin Laden's driver was able to enforce specific primary trial rights granted under the Geneva Conventions in domestic courts.  These Geneva based rights controlled the manner in which Hamdan could be tried.  Application of these principles demonstrates that the Optional Protocol creates primary rights for individuals.

The Optional Protocol contains numerous provisions that create primary rights for children.  The treaty protects these children from victimization from prostitution and sex trafficking by requiring the signator states to ensure that children are protected under the domestic laws of the United States of America.  Simply stated, if genocide is prohibited by a

16

treaty, then it can be said that citizens have a right to being free of genocide under domestic and international law.  For example, in the Optional Protocol article 3(b) it: protects children from conduct, which offers them for prostitution; protects children from acts that distributes, dissimilates or offers child pornography; and protects children from conduct, which authorizes or participates in these acts.  Article 9 grants the primary rights to child victims of the crimes listed in the protocol to have access to seek, without discrimination, compensation for those legally responsible under the protocol.  This includes participant Backpage.com.  Article 9 also grants children the right to be free from the dissemination of material, which advertises the attempts to solicit their victimization.  This includes the dissemination of ads by Backpage.com.

The treaty does not create an empty promise of a signator state to do something about child prostitution and child sex trafficking.  It creates specific promises to make specific acts prohibited.  This is the most effective and forceful way to create primary rights for a child to be free of such conduct by dastards, other irresponsible adults and profit at all costs type entities.  Article 16 holds that the treaty is binding on the United States.

Primary rights are created for a child to have access to adequate procedures to seek, without discrimination, compensation from those legally liable and protection from those who seek to advertise those crimes.  The key plain and concise words and phrases are "adequate procedures" and "without discrimination."  This is a clear statement that the Section 230 immunity, which existed when this treaty became a law, has no effect on child sex trafficking and prostitution matters.  To hold otherwise would discriminate by precluding adequate procedures when internet entities claim immunity under Section 230.  The internet is the most effective distribution and dissemination in the world.  To exclude the internet from the Optional Protocol's rights renders the treaty almost useless.

17

It is evident from the plain meaning of the text that the Optional Protocol protects individual rights.  It does not merely regulate international relations.  Therefore, if plaintiff is under eighteen years of age, these provisions create the above primary rights for her and every minor to be free from sex trafficking on the internet and everywhere else.

## C.  THE OPTIONAL PROTOCOL IS THE SUPREME LAW AND IS ENFORCEABLE DOMESTICALLY

The Constitution specifies: "All Treaties made…under the Authority of the United States, shall be the supreme Law of the Land."  U.S. Const. Art. VI, cl. 2.  This clause was subject to debate by the Frames who changed the authority of treaties from what existed under the Articles of Confederation.  It is not disputed that the Optional Protocol is a treaty made under the authority of the United States.  The record associated with ratification of the Optional Protocol supports the proposition that the convention has the status of supreme federal law.  The Department of State in its Initial Report on the Optional Protocol stated that all of the treaty's provisions are already implemented without enacting new legislation.  See Initial Report paragraph 3 of the introduction with states:

> 3. Prior to U.S. ratification of the Protocol, U.S. federal and state law satisfied the substantive requirements of the Protocol. Accordingly, no new, implementing legislation was required to bring the United States into compliance with the substantive obligations that it assumed under the Protocol, although a technical legal lacuna caused the United States to enter a reservation with respect to offenses committed on board a ship or aircraft registered in the United States. The provisions of the Protocol are not self-executing under U.S. domestic law, with one exception. That exception is Article 5, discussed below, which permits States Parties to consider the offenses covered by Article 3(1) as extraditable offenses in any existing extradition treaty between States Parties.

The initial report can be found on the U.S. Department of State website at

http://www.state.gov/g/drl/rls/84474.htmThese statements demonstrate that, at the time of

ratification, the government believed that all of the Optional Protocols' primary rights were self-executing, in the sense that no additional implementing legislation was required to give the Conventions the force of law in the United States be it though the treaty or the domestic mechanism.  See Restatement (Third) of Foreign Relations Law § 111, n.5 (1987)  ("If the Executive Branch has not requested implementing legislation and Congress has not enacted such legislation, there is a strong presumption that the treaty has been considered self-executing by the political branches, and should be considered self-executing by the courts.") .  The Department of State assured the United Nations that the rights granted by the treaty were already the rights of children in America.  Nothing can be clearer.

The term "self-executing," as applied to treaties, has multiple meanings.  See Committee of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 939 (D.C. Cir. 1988)(the "question whether a particular treaty requires implementing legislation is different from the international law question of whether the treaty aims at the immediate creation of rights and duties of private individuals…but both questions are part of the concept of self-executing treaties").   Self execution can mean that primary rights are created by the treaty, or that the treaty has the status of law without the need for implementing legislation.  Clearly stated, why would the United States pass laws to implement a treaty when such laws already exist?

Given that the Optional Protocol has the status of supreme federal law under the Constitution, and that the Optional Protocol clearly creates primary rights for individuals under the Optional Protocol, it follows that the Optional Protocol creates primary rights for individuals under domestic law.  See United States v. Schooner Peggy, 5 U.S. 103, 110 (1801)  (Where a treaty is the law of the land, and such affects the rights of parties litigating in court, that the treaty as much binds those rights and is as much to be regarded by the court as an act of

congress).  The very foundational meaning of the Supremacy Clause, is that it converts those primary treaty rights and duties into primary domestic rights and duties, without the need for implementing legislation.  See David Sloss, Non-Self-Executing Treaties: Exposing a Constitutional Fallacy, 36 U.C. Davis L. Rev. 1, 46-55 (2002)(Plaintiff's attorney thanks Professor Sloss for his personal imput and for permission to borrow his logic from the wonderful amicus brief he and Gary Thompson wrote in the Hamdan case).  This is especially true when the United States of America states that the undertakings to fully execute the treaty obligations into domestic law are already fully executed by existing domestic law.  If these domestic laws are construed by the judiciary to limit or take away the specific primary rights under the treaty, this would arguably be a violation of the United States of America's obligation under the Optional Protocol.

Any argument that if a treaty does not create a private right of action within the treaty it is not self-executing is mistaken.  A private right of action is the remedial right, not a primary right granted in the treaty.  See Henry M. Hart, Jr. & Albert M. Stacks, The Legal Process: Basic Problems in the Making and Application of Law 122-125, 137-38 (1994).  Therefore, any argument that the Optional Protocol is not self-executing does not contradict the conclusion that the Optional Protocol creates primary rights for individuals under domestic law, because it is entirely consistent to maintain that the Optional Protocol creates domestic primary rights, even if they do not expressly create domestic remedial rights.

## D. THE PRIVATE ACTION STATUTES, 18 USC 2255 AND 1595, PROVIDE REMEDIAL MECHANISMS WHICH AUTHORIZE CIVIL ENFORCEMENT OF THE OPTIONAL PROTOCOL TREATY RIGHTS BY INDIVIDUALS.

The Head Money Cases, 112 U.S. 580 (1884) support judicial enforcement of the Optional Protocol.  Therein Court stated: "A treaty, then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.  And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decisions for the case before it as would to a statute."  Id. at 598-99.  Since the Optional Protocol prescribe rules by which the primary rights of private individuals may be determined, Head Money Cases establishes a strong presumption in favor of judicial enforcement, at least in cases where domestic law supplies a private legal action, because such rights are of a nature to be enforced in courts.  In this case, the Private Actions Statutes provide that vehicle.  Therefore, the Optional Protocol does create primary rights for children and plaintiff has alleged that she is a victim of those who violated those treaty rights.  The treaty provisions that she invokes have the status of supreme federal law, and that treaty creates primary rights for individuals, and the Private Action Statutes create a private right of action that authorizes her to bring suit, therefore, she has the right to proceed unfettered by any older law that limits these rights.

**E.  THE FACT THAT THE OPTIONAL PROTOCOL DOES NOT EXPRESSLY CREATE DOMESTIC JUDICIAL REMEDIES IS IRRELEVANT TO PLAINTIFF'S RIGHT TO SUE.**

Any contention that even if the Optional Protocol create primary rights for individuals, and even if the Private Action Statutes authorize judicial enforcement of treaties, the Optional Protocol is not judicially enforceable because it does not expressly create domestic remedial rights is not correct.  This approach would bar judicial enforcement of most treaties because very few expressly create domestic remedial rights.  The framers of the Constitution favored judicial

21

enforcement of treaties, since they granted federal courts the power to decide treaty cases.  See

U.S. Const. Art. III, §2, cl. 1, the framers also gave the courts the duty to enforce treaties.  See

U.S. Const. Art VI, cl. 2.  Also See Martin S. Flaherty, History Right?: Historical Scholarship,

Original Understanding, and Treaties as "Supreme Law of the Land," 99 Colum. L. Rev. 2095

(1999) (demonstrating, through detailed historical analysis, that the Authors of the Constitution

favored domestic, judicial enforcement of treaties).  Thus, such a position flies in the face of the

original intent of the Framers.

        A contrary view implicitly assumes that a plaintiff's primary rights and remedial rights

must be derived from the same source.  That assumption is not supported in law, by the

Constitution or precedent.  The Administrative Procedure Act (APA) creates a private right of

action that authorizes individual suits to enforce other federal statutes that do not themselves

create a private cause of action.  In Norton v. Southern Utah Wilderness Alliance, 124 S. Ct.

2373 (2004), plaintiffs sued the Secretary of the Interior to enforce the Federal Land Policy and

Management Act (FLPMA).  Plaintiffs asserted a private right of action under the APA because

the FLPMA does not itself create a private cause of action.  Justice Scalia, writing for a

unanimous court, states that "the APA authorizes suit" for federal statutory violations "where no

other statute provides a private right of action."  Id at 124 S. Ct. at 2378.  Similarly, the Private

Action Statutes create a private right of action that authorizes individual suits to enforce her

primary rights under the treaty which does not create a private cause of action.  Any position that

in order to enforce treaties, the particular treaty as issue must expressly provide for domestic

judicial remedies, would make the primary rights under the treaty a legal nullity because very

few treaties expressly create domestic remedial rights.  In this case, the Department of State in its

initial Report specifically cited both Private Action Statutes and each additional statute which

plaintiff claims was violated, including 18 USC 2251, 18 USC 2252, 18 USC 2252A, 18 USC 2421, 18 USC 2422, 18 USC 2423, 18 USC 1590, and 18 USC 1591.  Nowhere is 42 USC 230 mentioned in the treaty documents.

Any claim that treaties are not judicially enforceable unless the treaty creates therein a domestic remedial rights is contrary to two centuries of jurisprudence, The Supreme Court has consistently enforced treaties that did not expressly create domestic judicial remedies.  In Ware v. Hylton, 3 U.S. 199 (1796), a British citizen sued two Virginia Citizens to recover payment on a bond.  Defendants argued that they had discharged their debt in accordance with a Virginia Statute.  Id. at 220-221.  Plaintiff raised article IV of the peace treaty with Great Britain which granted plaintiff's a primary right to recover their debt.  The treaty itself did not create a remedial right to sue in U.S. courts.  This absence was not a bar to recovery, because there was already a common law action for recovery on a bond that gave plaintiff a private right of action.  The plaintiff recovered his debt.  Ware, 3 U.S. at 245.  The treaty was judicially enforceable because the treaty created a primary right and there already existed a common law remedial mechanism which permitted a private suit to enforce the treaty.  That case is very analogous to the present case.

In Chew Heong v. United States, 112 U.S. 536 (1884), a detained Chinese laborer filed a habeas corpus petition in federal court to obtain release from custody.  Id. at 538.  He alleged that the detention violated Article II of a 1880 treaty, which gave Chinese laborers the right to come and go of their own free will.  The treaty itself did not grant Chew Heong a right to file a habeas corpus petition in a U.S. court.  The treaty granted no remedies.  The Supreme Court granted Chew Heong's habeas petition, holding that he was "entitled to enter and remain in the United States."  Chew Heong, 112 U.S. at 560.  The treaty was judicially enforceable because

23

the treaty created a primary right and habeas statute provided a domestic remedy to enforce that right.

More recently, in Asakura v. City of Seattle, 265 U.S. 332 (1924), the plaintiff, a Japanese national who operated a pawnbroker business in Seattle was affected by a Seattle ordinance that prohibited non-U.S.-citizens from operating a pawnbroker business in the city.  Id. at 339-40.  Plaintiff alleged the ordinance violated a treaty with Japan that granted Japanese citizens a primary right to carry on trade in the United States upon the same terms as an American.  Again, the treaty did not expressly grant a remedial mechanism, and there was no domestic legislation that authorized Japanese citizens any domestic remedial mechanism.  Even in light of this situation the Supreme Court affirmed an injunction relying on the traditional equitable action for injunctive relief as the basis for a domestic remedial mechanism to enforce these primary rights.  In essence, plaintiff is asking the court to enjoin enforcement of Section 230 immunity, or simply stated, that the treaty prevents section 230's application in these limited circumstances.

In American Insurance Ass'n v. Garamendi, 539 U.S. 396 (2003), the Supreme Court upheld a judicial remedy for a domestic plaintiff who sued to enforce international agreements that did not create domestic judicial remedies.  In Garamendi, Id, a trade association sued in federal court to enjoin enforcement of a California statue that required insurance companies to disclose policy information from European policies in effect from 1920 and 1945.  The Court held that certain agreements between the United States and European governments preempted the California law.  These agreements manifested the expectations that the federal government might invoke the agreements in support of motions to dismiss private lawsuits contrary thereto.  See U.S.-Germany Agreement, art. 2, para. 1 ("The United States shall, in all cases in which the

24

United States is notified that a claim described in article 1(1) has been asserted in a court in the United States, inform its courts…that dismissal of such cases would be in its foreign policy interests.").  In Garamendi, though, the insurance companies invoked the bilateral agreements offensively in support of a suit against the California Insurance Commissions to enjoin enforcement of a California statute.  See Garamendi, 539 U.S. at 412.  Even though there is no language in any of the agreements indicating that the drafters intended to authorize injunctive relief, the Court granted injunctive relief to plaintiffs on the grounds that the agreements trumped California law under the Supremacy Clause.  Id. at 427-29.  Thus, the Court in Garamendi implicitly relied on the Supremacy Clause as a basis for a private right of action to enforce international agreements that did not provide plaintiffs a right to sue in U.S. courts.

In Hamdan v. Rumsfeld, 548 U.S. 557 (2006), the Court permitted plaintiff to enjoin a military commission trial in contravention to rights granted to him under the Geneva Conventions even though the convention did not contain remedial mechanism.  The plaintiff again relied upon the habeas corpus laws as the remedial mechanism.  The Court held that military commissions convened in Guantanamo Bay to try him violated the Geneva Convention and the Uniform Code of Military Justice.

## E.  THE JUDICIAL BRANCH CAN PROVIDE THE REMEDIES FOR TREATY VIOLATIONS

The Supreme Court has enforced primary rights of individuals to restrain the President's exercise of the Commander-in-Chief power in wartime and Congressional wartime statutes. United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103 (1801), was one of the first cases in which the Supreme Court addressed treaty-based constraints on the executive and legislative actions in wartime.  In the late 1700's there was a series of hostile acts against U.S. merchant

ships, by the French government.  Congress responded by enacting a statute authorizing U.S. ships to capture armed French vessels.

In accordance with that statue, the President instructed duly commissioned U.S. ships to take any French vessel.  <u>Schooner Peggy</u>, 5 U.S. at 103.  The Trumball, a U.S. warship, captured the Schooner Peggy, a French merchant ship that fell within the statutory authority.  On September 23, 1800, the circuit court for the District of Connecticut declared the Schooner Peggy a lawful prize, and condemned the ship.  One week later the United States signed a treaty with France, which states among other things that property captured, and not yet definitively condemned shall be mutually restored.  <u>Id.</u> at 107.  The French owners of the Schooner Peggy filed for return of the ship.  The Supreme Court held that the Schooner Peggy had not been "definitively condemned", because a right to appeal the circuit court judgment had not expired. <u>Id.</u> at 108-09.  As the ship had not been condemned, the treaty required the return of the ship. There existed no remedy within the treaty or in domestic law to involve for the French where to obtain their treaty rights.  The Court was forced with a conflict between the treaty, which precluded condemnation and forfeiture, and on the other side, the congressional statute, the Presidential order, and the circuit court judgment, all of which required condemnation and forfeiture by force of law.  The Court had to decide, as a mater of domestic law, whether the treaty took precedence over the statute, Presidential order, and circuit court judgment.  The Court held: "The constitution of the United States declares a treaty to be the supreme law of the land. Of consequence its obligation on the courts of the United States must be admitted."  <u>Id.</u> at 109. The Court further held the treaty was the law in effect at the time of the Supreme Court's decision.  The Court concluded: "If it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law [i.e., the treaty], the judgment

must be set aside." Id. at 110.  Therein, a subsequent treaty was enforced over prior federal state and presidential order.

The Supreme Court ordered the restoration of the Schooner Peggy to its French owners in accordance with the treaty, despite the fact that the officers and men of the Trumbull had captured the Schooner Peggy as a lawful prize, acting pursuant to a valid Presidential order and federal statute.

In Plaintiff's case, the Optional Protocol became effective in 2003.  The immunity under Section 2-30 became law in 1996.  The law in effect now, the treaty, precludes enforcement of the immunity in so far as it applies to child sexual trafficking, child pornography and child prostitution (rape).  There exists primary treaty rights in favor of plaintiff and two domestic remedial mechanisms.  The treaty rights must prevail over the immunity if it is even applicable.

## V. UNDER THE CHARMING BETSEY DOCTRINE THE SECTION 230 IMMUNITY SHOULD BE CONSTRUED IN A MANNER NOT TO VIOLATE THE OPTIONAL PROTOCOLS

Plaintiff raises the Charming Betsey Doctrine, last but certainly not least among her points.  Even if this court holds that the Optional Protocols does not override the Section 230 immunity, the Charming Betsey Doctrine calls for the judiciary to construe the statutes in harmony with the law of nations if at all possible.  See Murray v. The Charming Betsey, 6 U.S. 2 Cranch 64 64 (1804), another captured ship case.  Therein at page 6 U.S. 118, the court stated:

> It has been observed that an act of Congress ought to never to be construed to violate the laws of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights or to affect neutral commerce further than is warranted by the laws of nations as understood in the country.

‌

This doctrine is still as important today as the day it was written.  See In re Applications to Enforce an Administrative Subpoena of the CFTC, 738 F 2d 487, 493 (D.C. Cir 1984).

In Weinberger v. Rossi, 456 U.S. 25 (1982), the court reiterated the fundamental doctrine by stating that some affirmative Congressional expression of intent was required before the court would construe a conflict between international agreements and a statute.

In this case, plaintiff has offered numerous fair constructions and interpretations which would permit the Optional Protocol to avoid the immunity.  42 USC 230 can co-exist with the treaty and the treaty can still be enforced.  The most obvious construction to avoid an unnecessary direct conflict is to construe the immunity not to extend to violations of the Optional Protocol based upon the language and definitions of section 230, which has language precluding immunity for violations of federal criminal laws and chapter 110.  Another interpretation is to hold defendant liable for the creation and maintenance of its website under the Private Action Statutes as an aider and abettor of crimes, or as an information content provider.

## CONCLUSION

This Court should make it the policy of this nation to  protect these young girls, who should be dealing with their first pimple instead of their first pimp.  Backpage.com should be held responsible.


/s/ Robert H. Pedroli, Jr.
Robert H. Pedroli, Jr. - #7616
PEDROLI & GAUTHIER
Attorneys for Plaintiff
7777 Bonhomme Avenue, Suite 2250
Clayton, MO  63105-1911
314/726-1817
314/726-6087 (Fax)

## CERTIFICATE OF SERVICE

      The undersigned hereby states that the foregoing, was electronically emailed mailed, postage prepaid, this 24th day of January, 2011, to Sableman, Mark [MSABLEMAN@thompsoncoburn.com] and Nepple, Michael L. [MNepple@thompsoncoburn.com].

                        /s/ Robert H. Pedroli, Jr.

29

Attachment for Convenience of Court.

Attached is the .PDF from

http://www.state.gov/g/drl/rls/84474.htm

 Which contains the treaties Initial Report; Instrument of Ratification; Principle U.S. Statutes cited in Report.

Also attached are the Missouri Attorney General news release and the Attorneys General letter to Backpage.com referred to on page two (2) of memorandum.