## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| M.A., a minor, by and through her | ) | |
| Natural Mother and Next Friend, P.K., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10cv1740 TCM |
| | ) | |
| VILLAGE VOICE MEDIA | ) | |
| HOLDINGS, LLC., d/b/a backpage.com, | ) | |
| and BACKPAGE.COM, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This is a two-count civil action having its genesis in the horrific victimization of M.A. by Latasha Jewell McFarland.[1]  M.A. seeks to hold defendants Village Voice Media Holdings, LLC, and Backpage.com, LLC (hereinafter collectively referred to as Backpage) liable for this victimization.  Backpage moves to dismiss the amended complaint.

## Background

McFarland was indicted in May 2010 for violations of 18 U.S.C. § 1591(b)(2) (prohibiting sex trafficking of children), 18 U.S.C. § 1952(a)(3) (prohibiting the use of interstate commerce to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity"), and 18 U.S.C. § 2422(b) (prohibiting the use of interstate commerce to "knowingly persuade[], induce[], entice[], or coerce[]  any individual who has not attained the age of 18 years, to engage in

---

[1] The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

prostitution . . . ."). See United States v. McFarland, No. 4:10cr0266 SNLJ (E.D. Mo. May 12, 2010). Four months later, she pled guilty to one of the three counts; specifically, to the count alleging a violation of § 1952(a)(3). Id. Her sentence includes a restitution requirement of $16,830.18 plus additional costs, "including future counseling costs of victim." Id.

Shortly after McFarland pled guilty, M.A. filed this action. In Count I, she seeks to hold Backpage liable under 18 U.S.C. § 2255.[2] Because the question before the Court must be answered by an examination of the amended complaint, portions of that complaint are set forth below. The allegations focusing on the injury to M.A. are as follows.

> That in 2009 and 2010 Plaintiff M.A., a minor, while being a fourteen year old runaway child, was being sexually trafficked by Latasha Jewell McFarland, an adult, who has pled guilty to criminal charges and has been sentenced relating to the allegations herein and has admitted to the following facts in open court which are stated as facts hereinafter; she photographed minor M.A. displaying private body parts in sexual pornographic poses; she posted this child pornography on [Backpage's] website, backpage.com in advertisements seeking payment for sex; she paid backpage.com for these sex ad postings; she reposted ads; she transported minor M.A. for the purposes of multiple sexual liaisons for money with adult male customers obtained through [Backpage's] website; she collected money for minor M.A.'s sexual services from these customers; and she purchased goods to facilitate these sexual services.

(Am. Compl. ¶ 10.)

---

[2] Section 2255 provides, in relevant part:
(a) **In general.**— Any person who, while a minor, was a victim of a violation of section 2241(c), 2242, 2243, 2251A, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation . . . may sue in any appropriate United States District Court and shall recover the actual damages such person sustains and the cost of the suit, including a reasonable attorney's fees.

Anticipating Backpage's defense of immunity under the Communications Decency Act (CDA), 47 U.S.C. § 230, M.A. describes Backpage as follows.

8. [A]t all relevant times herein [Backpage] operated an online classified marketing advertisement website in interstate commerce that allows the public to post for a fee, classified advertising for goods and services including categorized advertising for escorts under the adult section which also includes categories for transsexuals, strippers, body rubs, domination and fetish, and adult jobs . . . .

9. [Backpage is an] Information Content Provider[ ] within 47 U.S.C. 230 in that [Backpage was] responsible in part for the development and/or creation of information provided through the internet or other internet computer service in that: [Backpage's] website also has a search engine to allow focused searches by keywords of the postings; [Backpage] developed the value and impact of the posted ad alleged herein by creating the highly viewed website, wherein [Backpage] advertised that there are billions of page views of their ads per week and the website is a highly tuned marketing site with search tools, adult sex focused categories, and directions and features offered regarding how to increase the impact of your ad for a fee; [Backpage] offer[s] special ad placement for a fee; [Backpage] offer[s] automatic reposting to a top spot for a fee; [Backpage] offer[s] knowledge regarding how to post ads and pay anonymously; [Backpage] advertise[s] its website to increase page views of the ads; [Backpage] remove[s] spam from its website to increase page views of placed ad; [Backpage] offer[s] commissions to customers for referrals of other customers; and [Backpage] enable[s] viewers and posters to search and review popular searches; [Backpage has] posting rules and limitations which aid in the sight veiling of illegal sex services ads to create the veil of legality.

. . . .

11. In 2009 and 2010, [Backpage] posted many advertisements which included explicit nude photographs of Plaintiff, M.A., a minor, advertising her services as an escort for sex on backpage.com and received fees for each posting.

12. That [Backpage] had knowledge that: explicit sexual pornographic photographs were being posted on its website; that postings on their website were advertisements for prostitution; that numerous minors were included in these postings for prostitution on its website; that sex trafficking of minors is prolific in the United States of America; that the internet, including their website, was used for advertisements for illegal sexual contact with minors;

that on numerous prior occasions [Backpage was] made aware of minors being trafficked on their website; that according to [Backpage], on five prior occasions [Backpage] responded to subpoenas involving the trafficking of minors on backpage.com and this does not include other cases involving minors of which [Backpage is] aware wherein [Backpage] cooperated with authorities without subpoenas.

13. By posting explicit nude photographs of Plaintiff, M.A., a minor, in an advertisement which advertised her services as an escort for sex on backpage.com, [Backpage] facilitated child sex trafficking and aided and abetted McFarland in violating each criminal statute and United States Treaty Optional Protocol herein alleged, in that: [Backpage] had a strong suspicion that the aforementioned crimes were being committed yet was so indifferent that [it] failed to investigate for fear of what it would learn; [Backpage] had a desire that these posters accomplished their nefarious illegal prostitution activities so that the posters would return to the website and pay for more posting; and [Backpage] continued to maintain their website so as to participate in these illegal transactions. . . .

(Am. Compl. ¶ 8-9, 11-13.)

Also in anticipation of Backpage's § 230 defense, M.A. alleges that there is no immunity because Backpage (a) has aided and abetted crimes against her, in violation of the statutes listed in § 2255, see note 2, supra, and (b) has violated her primary rights under the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography. (Id. ¶ 15-[18].[3])

In Count II of her amended complaint, M.A. seeks to hold Backpage liable under 18 U.S.C. § 1595[4] for the conduct alleged in Count I.

_____

[3]The paragraph following paragraph number 17 is mistakenly labeled number 16. The numbering of subsequent paragraphs builds on this error. For instance, a second paragraph 17 follows the mislabeled 16; this paragraph 17 is followed by 18 and so forth. For ease of reference, the Court will cite the true number of the paragraph and indicate such by including that number in brackets.

[4]Section 1595(a) provides that:

As anticipated, Backpage moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The specific arguments and the opposition thereto are discussed below.

## Discussion

Standard of Review. When ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must take as true the alleged facts and determine whether they are sufficient to raise more than a speculative right to relief. **Bell Atl. Corp. v. Twombly**, 550 U.S. 544, 555-56 (2007). The Court does not, however, accept as true any allegation that is a legal conclusion. **Ashcroft v. Iqbal**, 129 S.Ct. 1937, 1949-50 (2009). The complaint must include "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" **Twombly**, 550 U.S. at 555 (quoting first Fed. R. Civ. P. 8(a)(2) and then Conley v. Gibson, 355 U.S. 41, 47 (1957)) (alteration in original); see also **Gregory v. Dillard's Inc.**, 565 F.3d 464, 473 (8th Cir. 2009) (en banc). Although detailed factual allegations are not necessary, a complaint that contains only "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." **Twombly**, 550 U.S.

---

An individual who is a victim of a violation may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

The chapter is Chapter 77 – Peonage and Slavery and includes statutes prohibiting enticement into slavery, § 1583, and forced labor, § 1589, and trafficking with respect to involuntary servitude and forced labor, § 1590.

at 555; accord **Iqbal**, 129 S.Ct. at 1949.   The complaint must set forth "enough facts to state a claim to relief that is plausible on its face." **Twombly**, 550 U.S. at 570; accord **Iqbal**, 129 S.Ct. at 1949; **Brown v. Medtronic, Inc.**, 628 F.3d 451, 459 (8th Cir. 2010); **Braden v. Wal-Mart Stores, Inc.**, 588 F.3d 585, 594 (8th Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." **Iqbal**, 129 S.Ct. at 1949. If the claims are only conceivable, not plausible, the complaint must be dismissed. **Twombly**, 550 U.S. at 570; accord **Iqbal**, 129 S.Ct. at 1950.  Also, in considering a Rule 12(b)(6) motion, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." **Braden**, 588 F.3d at 594.  The issue in considering such a motion is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim.  See **Neitzke v. Williams**, 490 U.S. 319, 327 (1989).

Standing.  Before addressing the merits of the parties' competing positions, the Court finds it necessary to define the injury at issue.  M.A. describes that injury in her amended complaint as being photographed by McFarland in pornographic poses, having those photographs posted[5] on Backpage's website[6] and used to advertise her for sex, and being

---

[5]"Post" is defined in the Internet context as "[t]o upload or input information that will be stored (either temporarily or permanently) on a website . . . or elsewhere online."  4 Ian C. Balloon, E-Commerce & Internet Law, Glossary at 40 (2011) (E-Commerce).

[6]"A website is an electronic location on the World Wide Web that may contain text, graphics, visual images or sound."  Id. at 60.  "A website has also been defined as 'an Internet address that permits the exchange of information with a host computer.'"  Id. (quoting Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 119, 1121 n.2 (W.D. Pa. 1997)).

transported and subjected to sexual liaisons with adult males who responded to the advertisements. (Am. Compl. ¶¶ 10, [26].) In her memorandum in opposition to the motion to dismiss, however, M.A. argues that she is not suing Backpage for the content of the postings[7] by McFarland but for the creation and maintenance of a particular website. (Pl. Mem. at 3-4.)

"'Under Article III of the United States Constitution, federal courts may only adjudicate actual cases or controversies.'" **Constitution Party of S.D. v. Nelson**, 639 F.3d 417, 420 (8th Cir. 2011) (quoting Pucket v. Hot Springs Sch. Dist. No. 23-2, 526 F.3d 1151, 1157 (8th Cir. 2008)). "To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must establish that he or she has suffered an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; that there is 'a causal connection between the injury and the conduct complained of'; and that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" **Id.** (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)); accord **Sierra Club v. Kimbell**, 623 F.3d 549, 556 (8th Cir. 2010).

The actual injury suffered by M.A. is, as she describes it, her victimization by McFarland. See **Pucket**, 526 F.3d at 1157 (explaining that the injury required for standing be "concrete, not conjectural or hypothetical") (internal quotations omitted). That injury has its origins, according to the amended complaint, in the postings of the advertisements by

---

[7]"In the online context, 'posting' refers to providing material that can be viewed by other users, much as one 'posts' notices on a physical bulletin board." **Fair Housing Council of San Fernando Valley v. Roommates.com**, 521 F.3d 1157, 1161 n.3 (9th Cir. 2008) (en banc)).

McFarland.  Absent the content of those postings, M.A. would lack the injury in fact required for Article III standing.  The means used to accomplish that injury is the posting of advertisements of Backpage's website.  Whether she has a cause of action against Backpage is addressed below, but is a separate concept from that of Article III standing.  <u>See</u> **Braden**, 588 F.3d at 591.  "[A] plaintiff may be able to assert causes of action which are based on conduct that harmed [her], but which sweep more broadly than the injury [s]he personally suffered."  **Id.** at 592.

Thus, the content of the posted advertisements is not, as M.A. urges, irrelevant to the question of § 230 immunity.

<u>Section 230 Immunity.</u>  Leaving no doubt about the impetus behind § 230's immunity, Congress set forth its findings and policy in the statute itself.

**(a)  Findings**

The Congress finds the following:

> **(1)**  The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.
>
> **(2)**  These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.
>
> **(3)**  The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.
>
> **(4)**  The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

> **(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States –

> **(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;
>
> **(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;
>
> **(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;
>
> **(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and
>
> **(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

47 U.S.C. § 230(a) and (b). Thus, "[a]s a matter of policy, 'Congress decided not to treat providers of interactive computer services like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing obscene or defamatory material written or prepared by others.'" **<u>Batzel v. Smith</u>**, 333 F.3d 1018, 1026 (9th Cir. 2003) (quoting <u>Blumenthal v. Drudge</u>, 992 F. Supp. 44, 49 (D. D.C. 1998)).

Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple

users to a computer server, including specifically a service or system that provides access to the Internet . . . ." 47 U.S.C. § 230(f)(2). An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Additionally, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Read together, these [last two] provisions bar [a] plaintiff[] from holding ISPs [internet service providers] legally responsible for information that third parties created and developed." **Johnson v. Arden**, 614 F.3d 785, 791 (8th Cir. 2010). "'Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them.'" **Id.** (quoting Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254 (4th Cir. 2009)). Consequently, "'[t]he majority of federal circuits have interpreted [§ 230] to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" **Id.** (quoting Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1321 (11th Cir. 2006)); accord **Perfect 10, Inc. v. CCBill LLC**, 488 F.3d 1102, 1118 (9th Cir. 2007). See also **Doe v. MySpace, Inc.**, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content.").

Backpage is a website operator. (See Am. Compl. ¶ 8.) As such, it "'can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But

as to content that it creates itself, or is responsible in whole or in part for creating or developing, the website is also a content provider.'" **Stayart v. Yahoo! Inc.**, 651 F. Supp.2d 873, 886 (E.D. Wis. 2009) (quoting Roommates.com, 521 F.3d at 1167).

M.A. argues that Backpage is not a service provider for purposes of § 230's immunity because, in part, (a) its website has a search engine for adult categories that allows searches of postings by keywords; (b) it "developed the value of the posted ads by working to create a highly viewed website"; (c) its website is claimed to be a "highly tuned marketing site"; (d) the website has instructions, for a fee, on how to increase the impact of the posted ads; and (e) it "offers special ad placement and re-posting for a fee." (Pl. Mem. at 3.) None of these characteristics distinguish Backpage from other ISPs that courts have found to be within the reach of § 230 immunity.

"Today, the most common interactive computer services are websites." **Roommates.com**, 521 F.3d at 1162 n.6. "A web site . . . 'enables computer access by multiple users to a computer server,' namely the server that hosts the web site." **Universal Commc'n Sys., Inc. v. Lycos, Inc.**, 478 F.3d 413, 419 (1st Cir. 2007) (quoting 47 U.S.C. § 230(f)(2)). See also **Faegre & Benson, LLP v. Purdy**, 367 F. Supp.2d 1238, 1249 (D. Minn. 2005) (operator of website on which Internet users could post comments was ISP); accord **Gregerson v. Vilana Fin., Inc.**, 2008 WL 451060, *9 (D. Minn. Feb. 15, 2008); **Whitney Info. Network, Inc. v. Xcentric Ventures, LLC**, 2008 WL 450095, *8 n.22 (M.D. Fla. Feb. 15, 2008). Backpage's operation of a website, without more, does not defeat § 230 immunity.

Nor does Backpage's use of a search engine to allow keyword searches of postings in its adult categories abrogate that immunity. "A key word is a search term that a user types into a search engine to locate websites or other content online." E-Commerce at Glossary 29-30. "A search engine allows users to find information by entering a search term, [for instance, a keyword,] and receiving a list of results." **800-JR Cigar, Inc. v. GoTo.com, Inc.**, 437 F. Supp.2d 273, 277 (D. N.J. 2006).

In the case of **Jurin v. Google, Inc.**, 695 F. Supp. 2d 1117 (E.D. Cal. 2010), the court concluded that Google was entitled to § 230 immunity from claims that it was violating state and federal laws by using plaintiff's trademarked name "Styrotrim" as a suggested keyword in its "AdWords" program. **Id.** at 1119. This program allowed advertisers to bid on keywords, thereby securing a more visible placement of their "Sponsored Link" ads when the keyword is searched for. **Id.** The AdWords program picked up "Styrotrim" as a commonly searched term and suggested it as a keyword to bidders. **Id.** at 1120. Consequently, successful bidders, including plaintiff's competitors, appeared as a "Sponsored Link" whenever plaintiff's trademarked name "Styrotrim" was used as a keyword. **Id.** Plaintiff argued that Google participated in the content of the advertisements by employing its keyword suggestion tool and was, therefore, an "information content provider." **Id.** at 1122. The court disagreed, holding that "[b]y suggesting keywords to competing advertisers [Google] merely helps third parties to refine their content. This is tantamount to the editorial process protected by the CDA." **Id.** at 1123. The keyword suggestion tool was a "'neutral tool,' that [did] nothing more than provide options that advertisers could adopt or reject at

their discretion, thus entitling the operator to immunity." **Id.** And, in **Rosetta Stone, Ltd. v. Google, Inc.**, 732 F. Supp.2d 628 (E.D. Va. 2010), the court rejected a similar trademark challenge by the plaintiff to Google's use of keywords in its AdWords program, finding that Google was "simply assist[ing] third party advertisers in refining their selected keyword terms" and that providing this assistance and making available keyword tools was an exercise of editorial discretion and not the creation of the Sponsored Link contents. **Id.** at 633. See also **MySpace, Inc.**, 528 F.3d at 420 (rejecting argument that website's search features qualified it as information content provider for purposes of § 230 immunity); **Stayart**, 651 F. supp.2d at 885 (finding Yahoo! entitled to § 230 immunity when it only displayed objected-to content in response to a computer user's search result and noting that "the only way Yahoo! could exert any control over the results of a search engine query would be to change its underlying, proprietary algorithm. This goes to the heart of Yahoo!'s role as an interactive computer service.").

Additionally, the creation by Backpage of an "adult" category does not impose liability on Backpage for ads posted in that category. In **Dart v. Craigslist, Inc.**, 665 F. Supp.2d 961 (N.D. Ill. 2009), the court found § 230 immunity protected a website from claims that the website facilitated prostitution. The plaintiff alleged that users routinely posted ads promising sex for money under the "erotic services" section of the website's classifieds. **Id.** at 962. "Craigslist created the categories, but its users create the content of the ads and select which categories their ads will appear in." **Id.** Moreover, the word-search

function provided by Craigslist "[did] not cause or induce anyone to create, post, or search for illegal content." **Id.** at 969.

The complained-of actions taken by Backpage to increase the revenues it derives from its website, e.g., touting its website as a "highly tuned marketing site" and instructing posters of ads on how to best increase the impact of those ads, does not defeat § 230 immunity. "[T]he fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interactive service provider 'creates' or 'develops' that content." **Goddard v. Google**, 2008 WL 524590, *3 (N.D. Cal. Dec. 17, 2008). See also **Lycos, Inc.**, 478 F.3d at 419, 420-21 (holding that website operator did not become information content provider "merely because the 'construct and operation' of the web site might have some influence on the content of the postings" or because website simply "provided 'culpable assistance to subscribers wishing to disseminate misinformation"); **Carafano v. Metrosplash.com, Inc.**, 339 F.3d 1119, 1124 (9th Cir. 2003) (questionnaire employed by dating service website to facilitate creation of profiles did not transform website into information content provider; the selection of content was left exclusively up to posters and no profile had any content until poster created it); **Whitney Info. Network**, 2008 WL 450095, *5 and *5 n.14 (website operator's suggestions to posters of how to make reports more interesting did not make it an information content provider for purposes of § 230 immunity).

In **MySpace, Inc.**, supra, the Fifth Circuit considered whether § 230 immunity barred claims by the mother and next friend of a 14-year old girl against a social network website alleging that the website was negligent in not preventing the daughter from lying about her

age and, subsequently, being sexually assaulted by a predator. 528 F.3d at 414. Without the MySpace postings, the predator and daughter would never have met and the assault would not have happened. **Id.** at 419-20. The court held that however "artfully" the claims had been pleaded, they were "directed toward MySpace in its publishing, editorial, and/or screening capacities." **Id.** at 420 (internal quotations omitted). And, "'so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selecting process.'" **Id.** at 419 (quoting <u>Carafano</u>, 339 F.3d at 1124).

In the instant case, to find Backpage to be not immune from suit based on M.A.'s allegations about how it structured its website in order to increase its profits would be to create a for-profit exception to § 230's broad grant of immunity. This the Court may not do.

M.A. further argues that Backpage should not be immune under § 230 because it "is aware of prior cases of minors being sexually trafficked on its website and based upon the posted ads and photography, no reasonable person could review the postings in the adult categories and deny prostitution was the object of almost each and every ad." (Pl. Mem. at 4.) The First Circuit noted in 2007 that "[i]t is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." **Lycos, Inc.**, 478 F.3d at 420. "Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content." **Id.** <u>See also</u> **Zeran v. America Online, Inc.**, 129 F.3d 327, 333 (4th Cir. 1997) ("Liability upon notice would defeat the dual purposes advanced by § 230 of the CDA."); **Gregerson**, 2008 WL 451060, *9 n.3 (finding that § 230 immunity extended to website operator even after operator was

made aware of objections to comments posted on website by third parties). Thus, even if a service provider knows that third parties are posting illegal content, "the service provider's failure to intervene is immunized." **Goddard**, 2008 WL 5245490 at *3.

M.A. also seeks to avoid § 230's broad immunity by characterizing Backpage as a developer of the content of McFarland's posted ads. (See Pl. Mem. at 12-13.) This is so, she argues, because Backpage (a) knew "that the venture in which it voluntarily participates is a venture where it and traffickers profit from prostitution, wherein, a substantial number of children are being statutorily raped" and (b) knew "that a vast number of ads are appearing on its website for prostitution and that it is doing much to maintain and improve its profitable prostitution forum." (Id. at 13.) These allegations are but another repeat of the allegations in her amended complaint that McFarland posted an ad on Backpage which led to her victimization and that Backpage, regardless of being on notice that its website might be being used for illegal purposes, did nothing to stop the ads from being posted and instead profited from such ads. As noted above, however, neither notice or profit make Backpage liable for the content and consequences of the ads posted by McFarland.

"[Section 230] does not define the term *development*." **FTC v. Accusearch, Inc.**, 570 F.3d 1187, 1197 (10th Cir. 2009). "The dictionary definitions for *develop* . . . revolve around the act of drawing something out, making it 'visible,' 'active,' or 'usable.'" **Id.** at 1198 (quoting Webster's Third New International Dictionary, 618 (2002)). The question whether a website operator is a developer for purposes of § 230 then is whether "was it responsible for the development of the specific content that was the source of the alleged liability?" **Id.** "[T]o be 'responsible' for the development of offensive content, one must be more than a

neutral conduit for that content." **Id.** at 1199. "[A] service provider is 'responsible' for the development of offensive content only if it in some way *specifically* encourages development of what is offensive about the content." **Id.** (emphasis added).

The sheriff who brought suit against Craigslist for allegedly facilitating prostitution by having an "adult" (formerly "erotic") section of Internet classifieds on its website cited in support of his position an advocacy group's conclusion that "'Craigslist is now the single largest source for prostitution, including child exploitation, in the country.'" **Dart**, 665 F. Supp.2d at 962. Regardless of this allegation[8] and the allegations that Craigslist profited from the website traffic generated by its adult-services section and that Craigslist "knowingly 'arranges' meetings for the purpose of prostitution and 'directs' people to places of prostitution," the court held that Craigslist was immune under § 230 unless it "created the offending ads." **Id.** at 967. It had not and could not be treated under § 230(c)(1), see page 10, supra, as having done so. **Id.** Similarly, however horrific the consequences to M.A. of McFarland's posted ads were, the ads were created by McFarland.

M.A. cites **Roommates.com**, 521 F.3d at 1167-68, and **Anthony v. Yahoo! Inc.**, 421 F. Supp.2d 1257 (N.D. Cal. 2006), in support of her argument that Backpage is a developer of the objectionable ad. Her reliance on these cases is unavailing.

The Ninth Circuit, sitting en banc, held that Roommates.com was the "information content provider" for the profiles of subscribers to its website to match people needing a

---

[8]Similarly, Plaintiff has submitted a letter to Backpage from the Attorney Generals of 21 states, including Missouri, asking that the adult sections portion of its website be taken down. The Court need not decide whether this letter may be considered on a Rule 12(b)(6) motion to dismiss because it is irrelevant for purposes of § 230 immunity.

place to live with people having rooms to rent.  **Roommates.com**, 521 F.3d at 1164.  This was so because it had developed "at least 'in part'" the information in the profiles.  **Id.** at 1165.  This information allegedly violated federal and state housing discrimination laws by *requiring* subscribers to include discriminatory criteria in their profiles.  **Id.** at 1161-62, 1166, 1167.  "By requiring subscribers to provide the [discriminatory] information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information."  **Id.** at 1166.  This active control of the content of the objectionable postings was what caused Roommates to be described as a developer.[9]  See **Id.** at 1166, 1169, 1170 n.24, 1172.  Indeed, the portion of the decision immediately preceding the portion quoted by M.A. makes it evident how important this control was to the court's conclusion.

> *It's true that the broadest sense of the term "develop" could include the functions of an ordinary search engine – indeed, just about any function performed by a website.  But to read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides.*  At the same time, reading the exception for co-developers as applying only to content that originates entirely with the website . . . ignores the words "development . . . in part" in the statutory passage "creation *or development* in whole *or in part*."  47 U.S.C. § 230(f)(3) (emphasis added).

**Id.** at 1167 (first emphasis added).

---

[9]Cf. **Carafano**, 339 F.3d at 1124 (holding that website's use of questionnaire to facilitate express of information by users while leaving selection of content up to users, its classification of user characteristics into discrete categories, and its collection of responses to specific essay questions did not transform website "into a 'developer' of the 'underlying misinformation'").

Similarly, in **Anthony**, supra, the court held that Yahoo! was not immune under § 230 from claims that it *created* false profiles to lure users into renewing their subscriptions. 421 F. Supp.2d at 1262-63.[10] And, in **FTC**, 570 F.3d at 1201, the website operator was found to have developed the objectionable content – confidential personal data – by soliciting requests for confidential information protected by law, paying researchers to find it, while knowing that the researchers were likely to use improper methods, and charging customers for the information.

In the instant case, there is no allegation that Backpage was responsible for the development of any portion of the *content* of McFarland's posted ads or specifically encouraged the development of the offensive nature of that content.[11] See **Ben Ezra, Weinstein and Co. v. America Online, Inc.**, 206 F.3d 980, 985 (10th Cir. 2000) (holding that interactive computer service did not "develop" allegedly inaccurate information about plaintiff's stock merely by communicating with providers of information and by deleting some information).

Rhetorically asking "should a website that solicits and facilitates illegal conducted be protected under the guise of a free internet," M.A. contends that the application of § 230

---

[10]The court also held that Yahoo! was not immune from allegations that it "sent 'profiles of actual, legitimate former subscribers whose subscriptions had expired and who were no longer members of the service to current members of the service'" to lure those members into renewing their subscriptions. 421 F. Supp.2d at 1263. "Because Anthony posits that Yahoo!s manner of presenting the profiles – not the underlying profiles themselves – constitute [sic] fraud, the CDA does not apply." **Id.** M.A.'s allegations of how Backpage operates its website, however, describe the ordinary functions of by websites.

[11]Indeed, the Court notes that M.A. argues at one point that Backpage is not being sued for the content of the ads.

immunity to Backpage is "indefensible." (Pl. Mem. at 6.) The court in the defamation suit

of **PatentWizard, Inc. v. Kinko's, Inc.**, 163 F. Supp.2d 1069 (D. S.D. 2001), summarized

the conflict in a case involving § 230 immunity between facilitating growth of the Internet

and preventing harm to individuals.

> [T]his case implicates some important issues of policy. On the one hand, the ability of individual users to log onto the Internet anonymously, undeterred by traditional social and legal restraints, tends to promote the kind of unrestrained, robust communication that many people view as the Internet's most important contribution to society. On the other hand, the ability of members of the public to link an individual's online identity to his or her physical self is essential to preventing the Internet's exchange of ideas from causing harm in the real world.
>
> The legislative resolution of these issues will, indirectly, shape the content of communication over the Internet. For now, the § 230 of the [CDA] errs on the side of robust communication, and prevents the plaintiffs from moving forward with their claims.

**Id.** at 1071-72 (internal citation omitted). Also, the court in **Blumenthal**, 992 F. Supp. at 51,

seemingly agreed with M.A.'s dismay with the scope of immunity, but nonetheless found it

to be within Congress' charge to change. Finding that § 230 immunity applied to defamation

claims brought against America Online (AOL) for content posted on AOL by its gossip

columnist, the court noted that AOL had certain editorial rights with respect to the content

provided by the columnist and disseminated by AOL, had promoted the columnist, and yet

took no responsibility for any damage he caused. **Id.** "AOL is not a passive conduit like the

telephone company, a common carrier with no control and therefore no responsibility for

what is said over the telephone wires. Because it has the right to exercise editorial control

over those with whom it contracts and whose words it disseminates, it would seem only fair

to hold AOL to the liability standards applied to a publisher or, at least, like a book store

owner or library, to the liability standards applied to a distributor. But Congress has made a different policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others." **Id.** at 51-52 (footnotes omitted).

Thus, regardless of M.A.'s characterization of the policy choice of denying § 230 immunity in such circumstances as alleged as "clear," it nonetheless is a matter Congress has spoken on and is for Congress, not this Court, to revisit.

18 U.S.C. § 2255.  M.A. seeks to hold Backpage liable under § 2255, see note 2, supra, not as a publisher of the content of McFarland's ads but "as an aider and abettor of minor sex trafficking by virtue of [its] above culpable conduct."  (Pl. Mem. at 5.)  In support of this position, M.A. cites **Doe v. Liberatore**, 478 F. Supp.2d 742 (M.D. Pa. 2007).  The question in that case was whether a diocese, church, bishop, and priest who had known of sexual abuse of a boy by another priest could be held liable under § 2255 to that boy.  The court rejected the defendants' argument that only the abuser-priest could be held liable under § 2255 because only he violated the statutes listed in § 2255,[12] holding that "if one has aided or abetted another in violating one of the [listed] statutes . . ., then he himself has committed an act indictable under that listed statute."  **Id.** at 756.  The court also rejected the plaintiff's argument that the defendants could be held liable for aiding and abetting, finding that the

---

[12]See note 2, supra.  At least one court has held that a criminal conviction for one of the listed statutes is not a prerequisite to a § 2255 action.  See **Smith v. Husband**, 376 F. Supp.2d 603, 612 (E.D. Va. 2005).

statute, 18 U.S.C. § 2, "requires that one acted with the intent to help those involved with a *certain* crime." **Id.** (internal quotations omitted).

Title 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

"Liability under [§ 2] requires the government to prove that a defendant associated himself with and participated in an unlawful venture in a way that shows he wished to bring it about, and that he acted to make the venture succeed." **United States v. Devries**, 630 F.3d 1130, 1133 (8th Cir. 2011).

The court in **Liberatore**, supra, held that the plaintiff had not shown that the defendants "consciously shared [the abuser's] knowledge of the underlying substantive offenses, as well as the specific criminal intent to commit them." 478 F. Supp.2d at 756. "While it is possible to infer knowledge from a combination of suspicion and indifference to the truth, there still remains no evidence even remotely suggesting that the [defendants] shared [the abuser's] *specific* intent to commit the sexual offenses." **Id.** at 756-57 (emphasis added).

As noted above, in considering a Rule 12(b)(6) motion, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." **Braden**, 588 F.3d at 594. Reading M.A.'s amended complaint as a whole, her allegations of Backpage aiding and abetting McFarland do not describe the specific intent

required for aiding and abetting under § 2. Rather, those allegations describe only a violation of § 2255 by "the creation and maintenance of [a] highly effective internet tool . . . ." (Pl. Mem. at 5.) In **Dart**, 665 F. Supp.2d at 967, the court held that Craigslist could not be held liable for facilitating prostitution and child exploitation under an "aiding and abetting" theory based on the misuse of its services by its customers. See also **Doe v. GTE Corp.**, 347 F.3d 655, 661 (7th Cir. 2003) (rejecting claim against internet service provider for customer's use of website to post images of plaintiff athletes who were unknowingly recorded unclothed; although provider enabled customer to post objectionable content, this did not defeat § 230 immunity); **Goddard**, 2008 WL 5245290 at *7 (finding that plaintiff's attempt to hold website liable under aiding and abetting theory was "simply inconsistent with § 230").

M.A. further argues that § 230's immunity does not apply to her § 2255 action because § 230(e)(1) specifically provides that it has no effect on criminal laws and is not to be construed to "impair the enforcement of, as relevant, chapter 110 of Title 18, or any other Federal criminal statute." 47 U.S.C. § 230(e)(1). In her count brought pursuant to § 2255, M.A. seeks an award of damages, attorney's fees, and costs. (Am. Compl. at 6.) These remedies are available under § 2255, titled "*Civil* remedy for personal injuries." 18 U.S.C. § 2255 (emphasis added).

"Criminal law" is "[t]he body of law defining offenses against the community at large, regulating how suspects are investigated, charged, and tried . . . ." Black's Law Dictionary, 431 (9th ed. 2009). Civil law is "[t]he law of civil or private rights, as opposed to criminal law or administrative law." Id. at 280. "The difference between civil law . . . and criminal

law turns on the difference between two different objects which the law seeks to pursue – redress or punishment.  The object of civil law is the redress of wrongs by compelling compensation or restitution . . . .  [I]n the case of crimes, the main object of the law is to punish the wrongdoer . . ."  Id.

In **Doe v. Bates**, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006), the court held Yahoo! was immune under § 230 in a suit brought against it under § 2255 on allegations that it knowingly hosted child pornography, including sexually explicit photographs of the plaintiff's minor son.  As does M.A., the plaintiffs argued that Yahoo! should be held liable because "it knowingly profited from trafficking of illegal child pornography" and "did nothing to prevent, remove, or block the illegal child pornographic material from being stored on its web site or its servers . . . ."  **Id.** at *3, 6.  Also sued was the man who had been convicted under 18 U.S.C. § 2252A for interstate distribution of child pornography.  **Id.** at *6.  M.A. argues that Backpage is liable under § 2255 because it is "the river through which internet sexual trafficking flows."  (Pl. Mem. at 5.)  In **Bates**, the plaintiffs alleged that Yahoo! "'created, hosted and maintained the *portal through which* thousands of pedophiles prospered and hundreds of children, including Johnny Doe, were victimized . . . ."  **Bates**, 2006 WL 3813758 at *15 (emphasis in citing source).  M.A. argues that Backpage was a participant; plaintiffs in **Bates** did also.  **Id.**  As in the instant case, however, the *content* of what was posted on Yahoo!'s website was provided by another.  **Id.** at *16.  In **Bates**, it was pornographic pictures of a minor child; in this case, it was pornographic pictures of a minor child.  Similarly to the policy arguments advanced by M.A., the **Bates** "Plaintiffs' invocation of Section 230(e)(1) rests on their generalized policy arguments rather than the text of the

statute.  Plaintiffs' core argument appears to be that Section 230(e)(1) must exempt civil claims under the child pornography statutes because child pornography is 'not to be tolerated' and '[i]f the prospect of civil liability provides a disincentive for engaging in child pornography over and above that provided by the prospect of fines and jail time, then that is a good thing.'"  **Id.** at * 22.  Adopting the magistrate judge's report and recommendation that the claims against Yahoo! be dismissed, the district court held that Yahoo! was immune under § 230 from the § 2255 action.  **Id.** at 5.  "While the facts of a child pornography case such as this one may be highly offensive, Congress has decided that the parties to be punished and deterred are not the internet service providers but rather are those who created and posted the illegal material, such as defendant Mark Bates, the moderator of the [child pornography] e-group."  **Id.** at *4.

M.A. characterizes the **Bates** holding as flawed and argues it should not be followed. (Pl. Mem. at 9.)  The holding is supported, however, by other cases applying the broad reach of § 230's immunity to websites that, whatever they did to increase their profitability and visibility, did not create the content of the offensive posted information.  As with the plaintiffs in **Bates**, this does not lead M.A. without a remedy under § 2255.  She may still pursue a civil remedy against McFarland.

18 U.S.C. § 1595.  M.A. next argues that she has a cause of action under § 1595 against Backpage and need not prove aiding and abetting because § 1595 has "its own culpability mens rea standard."  (Pl. Mem. at 6.)  Assuming, without deciding, that M.A.'s characterization of the statute is correct, for the reasons set forth above in the discussion on § 2255, Backpage remains immune under § 230 from her claims.

Optional Protocol. M.A. also argues that the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography[13] (hereinafter Optional Protocol), S. Treaty Doc. No. 106-37, 2000 WL 33366017 (entered into force Jan. 18, 2002), and the primary rights it creates takes precedence over § 230's immunity provision. (Am. Compl. ¶ 5.) Backpage disagrees.

The Optional Protocol requires that, inter alia, "[e]ach State Party shall ensure that, as a minimum, the following acts and activities are fully covered under its criminal or penal law, . . . : (a) In the context of the sale of children as defined in Article 2; (b) Offering, obtaining, procuring or providing a child for child prostitution as defined in Article 2 . . . ." Optional Protocol, supra, 2000 WL 33366017 at *8. Article 2 defines sale of children as "any act or transaction whereby a child is transferred by any person or group of persons to another for remuneration or any other consideration." Id. Child prostitution is defined as "the use of a child in sexual activities for remuneration or any other form of consideration . . . ." Id. Article 9 reads, in relevant part:

> 1. States Parties shall adopt or strengthen, implement and disseminate laws, administrative measures, social policies and programmes to prevent the offences referred to in the present Protocol.
>
> . . .
>
> 4. State Parties shall ensure that all child victims of the offenses described in the present Protocol have access to adequate procedures to seek,

---

[13]An "optional protocol" is "[a]n international legal instrument that modifies or amends an international human rights treaty, such as by adding other human rights or adding a new way of implementing the treaty rights." Victor H. Condé, 1 Human Righs in the United States: A Dictionary and Documents 195 (2nd ed. 2011). "Because a protocol is itself an international legal instrument, it must go through all the formalities of a treaty." Id.

without discrimination, compensation for damages from those legally responsible.

     5.  State Parties shall take appropriate measures aimed at effectively prohibiting the production and dissemination of material advertising the offences described in the present Protocol.

Id. at *11.  The analysis by the Department of State that accompanied the transmittal of the Optional Protocol to the Senate for its advice and consent to ratification concluded that the United States met the requirements of Article 9.[14]  Id. at *1, 30.  Specifically, "[w]ith respect to Article[] 9(1) . . ., it is a priority commitment for the United States at both the federal and state levels to strengthen and implement laws to prevent the offenses prohibited by the Protocol."  Id.  "With regard to the requirements of Article 9(4), . . . there is mandatory restitution for victims in these cases under federal law."  Id. at *31.  "Consistent with the provisions of Article 9(5), U.S. law contains certain restrictions on advertising that are appropriate under our legal system.  For example, 18 U.S.C. § 2251 proscribes advertising child pornography when the child pornography actually exists for sale or distribution."  Id.

When the Senate ratified the Optional Protocol, it did so subject to, inter alia, declarations that "the provisions of the Protocol (other than Article 5[15]) are non-self executing," "current United States law . . . fulfills the obligations of the Protocol for the United States; and, . . . accordingly, the United States does not intend to enact new legislation to fulfill its obligations under the Protocol."  Convention on the Rights of the

---

[14]See **United States v. Frank**, 486 F. Supp.2d 1353, 1358 (S.D. Fla. 2007) (noting that such an analysis is a form of legislative history).

[15]Article 5 concerns extradition.

Child on the Sale of Children, Child Prostitution and Child Pornography – Treaty Document No. 106-37B, 148 Cong. Rec. S5717-01, 2002 WL 1332171 (June 18, 2002).

"Th[e] [Supreme] Court has long recognized the distinction between treaties that automatically have effect as domestic law, and those that – while they constitute international law commitments – do not by themselves function as binding federal law." **Medellin v. Texas**, 128 S.Ct. 1346, 1356 (2008). "[A] treaty is equivalent to an act of the legislators, and hence self-executing, when it operates of itself without the aid of any legislative provision." **Id.** (internal quotations omitted). "[W]hile treaties may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." **Id.** (second alteration in original); accord **Raffington v. Cangemi**, 399 F.3d 900, 903 (8th Cir. 2005). Moreover, "[e]ven when treaties are self-executing in the sense that they create federal law, the background presumption is that [i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." **Medellin**, 128 S.Ct. at 1356 (internal quotations omitted) (second alteration in original). See also **Katel L.L.C. v. AT&T Corp.**, 607 F.3d 60, 67 (2nd Cir. 2010) (noting that "[t]here is a presumption that treaties do not create privately enforceable rights in the absence of express language to the contrary") (internal quotations omitted); accord **Gross v. German Foundation Industrial Initiative**, 549 F.3d 605, 615 (3rd Cir. 2008); **Renkel v. United States**, 456 F.3d 640, 643 (6th Cir. 2006)

Clearly, the Optional Protocol is not self-executing; indeed, the Senate has declared it not to be. "For a non-self-executing treaty, any private claim must be based on a violation

of the domestic law implementing the provisions of that treaty." **Renkel**, 456 F.3d at 643

(finding no private right of action pursuant to a treaty that the United States Senate declared

to be not self-executing when ratifying it) (citing <u>Raffington</u>, 399 F.3d at 903).  In the instant

case, the Senate expressly declared when ratifying the Optional Protocol that its obligations

under the Protocol were fulfilled by existing law and no new legislation was intended.[16]

Existing law includes statutes making child prostitution and peonage a felony, statutes

providing for a private right of action for violations of that law, and a statute immunizing

internet service providers from suits arising from the content of postings on the internet.

This latter statute, § 230, does not make the other statutes chimerical.  People, McFarland,

for instance, may be prosecuted for child prostitution or child peonage.  Victims, M.A., for

instance, may bring a private right of action against McFarland or any other provider of the

content of the postings which led to her victimization for subjecting her to child prostitution

and child peonage.

　　Plaintiff's contention that "[a]ny claim that treaties are not judicially enforceable

unless the treaty creates therein a domestic remedial rights [sic] is contrary to two centuries

of jurisprudence" is answered by the Supreme Court's decision in **Medellin**, supra, also

focusing on an optional protocol.  The protocol at issue did, as here, provide that it was non-

self-executing.  The Court held that "the terms of a non-self-executing treaty can become

domestic law only in the same way as any other law – through passage of legislation by both

---

[16]Plaintiff argues that the government must have believed the Optional Protocol's primary rights to be self-executing insofar as no additional implementing legislation was required.  (Pl. Mem. at 19.)  This argument brushes aside the express statement on ratification that the Optional Protocol was *not* self-executing.  Implementing legislation was therefore required; but, *existing* legislation was sufficient.

Houses of Congress, combined with either the President's signature or a congressional override of a Presidential veto."  128 S.Ct. at 1369.  When the Senate ratified the Optional Protocol, existing legislation included § 230.

Seemingly recognizing this quandary, Plaintiff asks the Court to hold that the treaty prevents the application of § 230 "in these limited circumstances."  (Pl. Mem. at 24.) However sympathetic the Court might be to M.A.'s situation, the Court cannot ignore the Senate's language when ratifying the Optional Protocol or disregard the Supreme Court's jurisprudence on non-self-executing treaties.

The Court also finds M.A.'s arguments that, under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (APA), and the Charming Betsey doctrine unavailing.

The APA provides for judicial review of a "legal wrong" or adverse affect suffered by a person "because of *agency* action . . . ."  5 U.S.C. § 702 (emphasis added).  "'[A]gency means each authority of the Government of the United States . . ." with certain exceptions not applicable to the instant case.  5 U.S.C. § 701(b)(1).  "The APA is not an independent jurisdictional provision," but "is a procedural statute that . . . merely provides the framework for judicial review of *agency* action."  **Ochoa v. Holder**, 604 F.3d 546, 549 (8th Cir. 2010) (emphasis added).  Because Backpage is not an agency, M.A. may not seek judicial review under the APA of any action or inaction by Backpage.

M.A. correctly notes that under **Murray v. The Schooner Charming Betsey**, 6 U.S. (2 Cranch) 64, 118 (1804), "an act of Congress ought to never to be construed to violate the laws of nations if any other possible construction remains . . . ."  M.A. overlooks, however,

the terms on which the Senate ratified the Optional Protocol. As discussed above, those terms fatally undermines her reliance on the <u>Charming Betsey</u> doctrine.

**<u>Conclusion</u>**

Plaintiff artfully and eloquently attempts to phrase her allegations to avoid the reach of § 230. Those allegations, however, do not distinguish the complained-of actions of Backpage from any other website that posted content that led to an innocent person's injury. Congress has declared such websites to be immune from suits arising from such injuries. It is for Congress to change the policy that gave rise to such immunity. <u>See</u> **<u>Defenders of Wildlife, Friends of Animals and Their Environment v. Hodel</u>**, 851 F.2d 1035, 1039 (8th Cir. 1988) (holding that "a court will not decide 'abstract questions of wide public significance' most appropriately addressed by the legislature") (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 500 (1975)).

Accordingly,

**IT IS HEREBY ORDERED** that the motion to dismiss of Village Voice Media Holdings, LLC, and Backpage.com, LLC is **GRANTED**. [Doc. 27]

An appropriate Order of Dismissal shall accompany this Memorandum and Order.


/s/Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  15th  day of August, 2011.